No. 46,922

ORVILLE KIMSEY, *et al., Appellants,* v. BOARD OF EDUCATION, UNIFIED SCHOOL DISTRICT # 273 OF MITCHELL, OTTAWA and CLOUD COUNTIES, STATE OF KANSAS; WILLIAM EARLE, et al., *Appellees.*

(507 P. 2d 180)

Opinion filed March 3, 1973.

*Paul L. Aylward,* of Ellsworth, argued the cause, and *Ron Svaty,* also of Ellsworth, was with him on the brief for the appellants.

*James D. Waugh,* of Cosgrove, Webb and Oman, of Topeka, argued the cause, and *Harry W. Gantenbein,* of Beloit, was with him on the brief for the appellees.

The opinion of the court was delivered by

FOTH, C.: This is a taxpayers' suit to enjoin the issuance of $2,334,000 worth of bonds by the defendant board of education of

Unified School District No. 273, Beloit. The trial court refused to enjoin the bonds, and the plaintiff taxpayers have appealed.

In question is an election held February 26, 1972, at which the bond proposition carried by a vote of 1388 for, to 1163 against. Plaintiffs claim several procedural deficiencies and irregularities, some of which they assert are serious enough, standing alone, to invalidate the election, and some of which they concede must be shown to have affected the outcome. We accept this classification of their claims and shall treat them accordingly.

The first and primary contention is that the board of education never adopted a resolution stating "the purpose for which bonds are to be issued and the estimated amount thereof," as required by K. S. A. (then 1971 Supp.) 72-6761. That section provides in part:

"The board shall have authority to select a school site or sites. When a board determines that it is necessary to purchase or improve a school site or sites, or to acquire, construct, equip, furnish, repair, remodel or make additions to any building or buildings used for school purposes, or to purchase school buses, such board may submit to the electors of the unified district the question of issuing general obligation bonds for one or more of the above purposes, and upon the affirmative vote of the majority of those voting thereon, the board shall be authorized to issue such bonds. *The board shall adopt a resolution stating the purpose for which bonds are to be issued and the estimated amount thereof.*" (Emphasis added.)

(The balance of the section deals with notice of the election, contest actions, debt limitations and small exempt issues, and interim or short term financing.)

The trial court held that such a resolution was not only not a *prerequisite* to the holding of an election, but that it would more properly be adopted *after* the election. It noted the position of the requirement in the statute *after* the provisions authorizing the election and bond issue, and observed that "The statute provides for only one resolution." A resolution before the voters had spoken and the cost of the project ascertained would be "premature."

Our approach is a little different, because we are convinced the record shows substantial compliance with the statute, particularly in light of its purpose and function.

There is no requirement that this resolution be published; hence it is not intended to give notice to the taxpayers of the board's intended action. In this respect it is unlike resolutions adopted under K. S. A. 72-8211, where the board proposes to acquire teacherages, or under 72-8215, where a capital outlay levy is proposed.

In each case the resolution reflecting the board's intended action must be published, thereby notifying the taxpayers that they may protest and force the issue to an election. Under the bond statute we are dealing with here, separate formal notice of the proposal is given by three publications, each containing specific information about the time and place of the election and the actual proposition to be voted on.

Neither is it required that the resolution be forwarded to the election officer in order to trigger action by him. This is in contrast to K. S. A. 72-1626, governing bond procedures for the former boards of education in first and second class cities, prior to unification. There, a certified copy of the resolution, signed by the clerk and countersigned by the president of the city board of education, was sent to the mayor. It thereupon became the duty of the mayor to issue a proclamation calling the bond election. There is no parallel provision in the acts relating to unified school districts.

Since the statute requires no publication and no transmittal of the resolution to anyone outside the board we conclude it is essentially an internal document. Its purpose, as we see it, is to ensure that the requisite majority of the board favors the issuance of the bonds, with knowledge of the nature of the project and its estimated cost. Although not embodied in any single, formal "resolution," we think this required and desirable state of knowledge and intent is amply reflected in the board's minutes.

The inadequacy of the district's facilities for secondary education had been a matter of long-standing concern in the community. In 1967 a citizens' committee had made a study and recommendations. A "master plan" to meet the educational needs of the district was prepared by an independent consultant and was adopted by the board in 1969; modifications to it were made in 1970. At least four prior bond proposals had been defeated, the last in January, 1971. The proposals were for a secondary school facility.

After the 1971 defeat the board contemplated its future course. On February 1, 1971, it resolved *not* to have another election in April of that year (which would have coincided with the regular school election).

On April 5, 1971, it adopted a resolution finding the present junior and senior high school facilities "inadequate" and expressing an intention to have an election at the earliest possible date to "request the patrons of the district to authorize funds for the erection

of a new facility to house those youngsters who are presently inadequately housed."

On September 13, 1971, the board, with three of its seven members new since April, unanimously adopted a motion "that the board proceed with the present building plans and select a tentative voting date sometime in February and all commit ourselves to its support." It was also agreed to include in the building proposal vocational educational facilities.

An important motion was adopted unanimously on October 18, 1971, "that the board hold the school bond election on Saturday, February 26, 1972, for $2,334,000.00." There was considerable discussion at that meeting of the project and of means of promoting the election.

A second significant resolution was unanimously adopted on December 6, 1971:

"RESOLUTION

"Be it resolved by the Board of Education of Unified School District No. 273, Mitchell County, State of Kansas that said Board apply to the State School Fund Commission, pursuant to K. S. A. 75-2315, *et seq.*, for authority to call and hold an election to authorize the issuance of bonds of said District in excess of the amount which said District may now issue under the provisions of K. S. A. 72-6761, for the purpose of providing funds to pay the cost of purchasing and improving a site or sites, and constructing, furnishing, equipping and remodeling, and making additions to building or buildings for school purposes within said District.

"Be it further resolved that notice of the intent to file such application be given to the electors of said District by publication in The Beloit Daily Call a newspaper of general circulation in said District."

(This action, referred to in the bond fraternity as an "excess application," was required because the amount of bonds proposed would otherwise have put the district over its debt limit. Its effect will be discussed later.)

From the foregoing it is readily apparent that long before the election the board was thoroughly aware of and had formally determined the "purpose for which bonds are to be issued and the estimated amount thereof" as the statute requires. Even without the earlier, background motions and resolutions noted above, the resolution of December 6 established the *purpose,* and the motion of October 18, 1971, established the *amount.* Taken together, the two substantially meet the requirement of the statute, and certainly satisfy its intent and purpose.

It is of no consequence that the October action was by "motion"

rather than by "resolution." For practical parliamentary purposes the two are synonymous. Thus, *Black's Law Dictionary* (4th ed. 1951) defines the terms:

"MOTION. Parliamentary law. The formal mode in which a member submits a proposed measure or *resolve* for the consideration and action of the meeting." (Emphasis added.)

"RESOLUTION. A formal expression of the opinion or will of an official body or a public assembly, adopted by vote; as a legislative resolution. . . .

. . . . . . . . . . . . . .

"Legislative Practice

"The term is usually employed to denote the adoption of a *motion*, the subject-matter of which would not properly constitute a statute; such as a mere expression of opinion; an alteration of the rules; a vote of thanks or of censure, etc." (Emphasis added.)

The second omission, which the plaintiffs claim was an essential prerequisite to calling the election, was the order of the board of school-fund commissioners permitting the district to exceed its statutory debt limit. This claim is based on the fact that the commissioners' order was entered on February 2, 1971, and mailed from their office on February 3, 1972. On the latter date the first notice of the bond election was published and the board had, of course, taken many steps prior to that time both to promote the bonds and to put the election machinery in motion.

After the resolution of December 6, 1971, quoted above, application was duly made pursuant to K. S. A. 75-2315 *et seq*. This section is part of a continuation of a 1911 act on the subject, and the operative section is 75-2316:

"The board of school-fund commissioners of the state of Kansas is hereby authorized and empowered to make an order *authorizing any school district to vote bonds* for the purpose of purchasing or improving a site or sites, constructing, furnishing, equipping, repairing, remodeling or making additions to schoolhouses or other necessary buildings or purchasing school buses to an amount to be determined by the board of school-fund commissioners, and in addition to, the amount of bonds which such district may be otherwise authorized to issue." (Emphasis added.)

It will be noted that under this section the commissioners' order authorizes a district to "vote bonds" in excess of its debt limit— it does not authorize the district to call an election.

The following section, 75-2317, provides that the commissioners' powers are to be invoked by the filing of an application "that the permission of the said board of school-fund commissioners be given *for the voting and issuance* of additional bonds as provided

in the preceding section." (Emphasis added.) Again, no mention is made of the *calling* of the election.

From these statutes we conclude that the permission of the school-fund commissioners must be granted before a school district may either vote or issue bonds in excess of its debt limit, but that such permission is not a condition precedent to the steps preliminary to the election such as announcing it, campaigning, or giving the statutory election notices. Had the school-fund commissioners turned down the application the election would necessarily have been cancelled—but that did not happen.

It is not significant that the formal order of the school-fund commissioners was not mailed to the board, but went instead to its retained fiscal adviser or its bond counsel. The controlling fact was that, at the time the election was *held*, valid authority to hold it had been granted.

Plaintiffs' next objection goes to the wording of the proposition:

"A proposition to issue the general obligation bonds of Unified School District No. 273, Mitchell County, State of Kansas, in an amount not to exceed $2,334,000.00 for the purpose of providing funds to pay the cost of constructing, furnishing and equipping a building or buildings for junior high school purposes and for senior high school purposes within the District, pursuant to K. S. A. 72-6761, 75-2315 and 10-101 et seq."

Plaintiffs argue that the proposition is unclear in that it does not indicate whether one building is to be built for both junior and senior high purposes, a separate building is to be built for each, or some other combination is to be built. In support they cite our cases holding that "when a special proposition is submitted to a popular vote the recitals on the ballot shall clearly state the substance of the question the electors are to vote upon; and where that proposition is so obscurely stated that the electors may be misled thereby, the election is vitiated; . . ." *Kansas Electric Power Co. v. City of Eureka,* 142 Kan. 117, 45 P. 2d 877, Syl. ¶ 2. See also, *Wycoff v. Board of County Commissioners,* 189 Kan. 557, 560, 370 P. 2d 138; and *West v. Unified School District,* 204 Kan. 29, 33-34, 460 P. 2d 103.

There can be no quarrel with this general proposition—the elector is entitled to know what his money is going to be used for when he votes. In *Unified School District v. Hedrick,* 203 Kan. 478, 454 P. 2d 536 we noted that this test is applied to all bond propositions, regardless of the authorizing statute or the type of issuing municipality.

One general category of cases where this court has held bond propositions "bad for obscurity" is where the scope and total cost of the project wasn't made known to the voters. The following are typical of this class. In *Board of Education v. Powers,* 142 Kan. 664, 51 P. 2d 421, the total cost of a proposed school building was $391,500, of which $176,175 was to come from the federal government; the voters were merely asked to vote $198,500 in bonds. In *Kansas Electric Power Co. v. City of Eureka,* supra, the proposal was merely to issue $65,000 in bonds to construct a power plant and distribution system; no mention was made of an additional required outlay of $99,974. Most recently, in *Unified School District v. Hedrick,* supra, the voters were asked to approve a $15,000,000 bond issue for a long term building program; no mention was made of the fact that the cost of the project was to be $27,000,000, with the balance of $12,000,000 coming from building funds and federal grants. In each of these cases the election was voided because of the failure of the ballot proposition to fully apprise the electors of the true nature of the proposed action of the governing body.

A second variety of invalid propositions comprises those where more than one proposition is submitted without the required separation. *Unified School District v. Hedrick,* supra, approached this issue, but whether the board's intent to build some fourteen different facility improvements could be submitted as one proposition was not necessary to the decision, and the court expressly declined to decide the question. The test there stated, however, was whether the projects were so connected as to be but one proposition. This was in line with *Robertson v. Kansas City,* 143 Kan. 726, 56 P. 2d 1032, where this court approved as one project "improving the public levee of the city by constructing flood protection works, raising the surface thereof, and the construction thereon of docks, wharves, river and rail terminals and a grain elevator terminal dock and wharf. . . ." (p. 727.)

Similarly, in *Pittsburg Board of Education v. Davis,* 120 Kan. 768, 245 Pac. 112, it was held to be one proposition to issue bonds "for the purpose of purchasing sites for school buildings, and for the purpose of constructing additions to school buildings, and for the purpose of constructing new school buildings in the city of Pittsburg, Kansas[.]" (pp. 769-70.) Of defendant's argument of "duality" we said:

"If the argument of the defendant were correct, every proposition submitted for adoption would have to be separated into its last details. That is not the intention of the law. It intends that a single question as a whole shall be submitted as a whole. Here was a question of providing proper school facilities—one proposition, and it was properly submitted as such." (p. 770.)

In the *Pittsburg* case the court relied on *Thomas v. Covell*, 119 Kan. 684, 240 Pac. 574, where we held (p. 686):

". . . Procuring a site, erecting a building, and paying for site and building by bonds, are not tendered as disconnected subjects to be separately considered and voted on. They are tendered combinedly, as constituting one municipal project, to be approved or disapproved as a whole, . . ."

In none of these cases was the governing body required to spell out its plans in detail in the bond proposition. It was sufficient if one project was generally described, even if it entailed several phases or components.

As we see plaintiffs' complaint in this case, it boils down to the fact that they don't know whether the board will build one or more than one building—it is clear that whatever will be built will be for junior and senior high purposes. We had occasion to consider this type of complaint as recently as *Baker v. Unified School District*, 206 Kan. 581, 480 P. 2d 409. There the argument was that the school board proposed to vary from the building described in its pre-election brochures. We there took note of a school board's fiscal facts of life—until the bonds are authorized it has no funds to hire an architect, and until plans are drawn final details are necessarily uncertain. As we there said (p. 583):

"Discretion and responsibility for construction of the school building are vested by the legislature in the school board. Discretion and responsibility for construction of the building are not vested in the appellants and not in this court. (See *Warner v. City of Independence*, 121 Kan. 551, 558, 247 Pac. 871.)"

Here we are not surprised at testimony indicating that the board is not yet settled on one building or two—it will depend on what can be built within the money available. Apart from that, we may judicially note that many secondary school facilities today are built on a "campus" plan, with several detached buildings constituting one educational facility.

The choice is, as noted, to be exercised by the board. The voters were apprised of the nature of the project—one or more buildings "for junior high school purposes and for senior high school purposes." We think it was unnecessary for the board to determine at that time, or to submit to the electors, the question of whether

the purpose would be accomplished through one building or more. As we said in *Pittsburg Board of Education v. Davis*, supra, "Here was a question of providing proper school facilities—one proposition, and it was properly submitted as such." Of course, should the board depart from its expressed intention of providing facilities for junior and senior high school purposes, a remedy is provided under K. S. A. 10-117. That fact would not invalidate the bonds.

Plaintiffs next argue that the election was void because it was held on a Saturday. They cite no authority for this proposition, nor can we find any; the parties agree that there is no statute which either expressly authorizes or expressly prohibits a Saturday election. Plaintiffs would have us find an *implied* prohibition from the fact that the timetable for absentee voting, as it then existed, was apparently geared to the ordinary Tuesday elections. That is to say, under former K. S. A. 1971 Supp. 25-1122 (*b*) (6), *applications* for absentee ballots at a special election had to be made by the Thursday preceding the election, whereas under the then K. S. A. 1971 Supp. 25-1122 (*d*) and 25-1124 the deadline for *casting* such ballots was the Monday noon before the election. It is apparent that this schedule works well for Tuesday elections—or Wednesday elections, which plaintiffs would also bar by negative implication—but not for elections on other days of the week. As to the latter, it would appear to authorize applications for ballots to be made after the deadline for casting them had passed.

We cannot for this reason hold a Saturday election void. The statutes give the board the right to fix the date, without any specific limitation. The mechanical problem noted above has been recognized and remedied by the legislature (Laws 1972, ch. 134). Absentee ballots cast by mail or otherwise transmitted will not be received until "the hour for closing of the polls." (K. S. A. 1972 Supp. 25-1124.) Those cast in person will now be received until noon "on the day preceding any such election." (K. S. A. 1972 Supp. 25-1122 [*d*].) We take this as legislative recognition of the common practice of holding special elections—and especially school bond elections—on days other than Tuesday. (See, *e. g., West v. Unified School District*, supra, where the election was held on a Friday, and no contention was made that this was improper.)

In this case the election officer solved the problem by the simple expedient of accepting applications only up until the statutory Monday deadline for casting the ballots. The evidence indicates that possibly as many as, but not more than, thirty persons inquired about

absentee ballots after that deadline and before the election. There was no showing as to whether any of these thirty were deprived of a vote, or whether some or all of them actually went to the polls. In any event their total vote would not have affected the outcome of the election.

The last issue on which plaintiffs claim we should declare the election void involves the designation of voting places by the county election officer, the county clerk. Four were designated within the city of Beloit, one for each ward, and one each in the towns of Simpson and Scottsville. Voters of the district residing outside the city limits of Beloit were authorized to vote at any of the six voting places.

K. S. A. 1971 Supp. 25-2701 provided (and still provides) that "The county election officer shall determine the area to be served by each voting place at every election. . . ." As used in that section the term "area" is defined in 25-2506 (c) as "territory served *by one voting place* and may include part or all of one or more precincts or voting districts." (Emphasis added.) That statute goes on to say that "In school, city and special district elections an area may include part or all of one or more wards or townships; and if the territory of such school, city or special district extends into more than one county, an area may extend into any such county."

Taken together the statutes afford a good deal of flexibility in designating polling places and the territory each is to serve; precinct, ward, township and even county lines may be ignored. But we do think the statutes contemplate that each voting place is to serve only one defined "area," and that each voter should have but one place at which he may vote, depending on the "area" in which he lives.

However, this does not mean that the election was void. We were confronted with almost the same situation in *West v. Unified School District,* supra, where three voting places were designated and the voters were free to vote at any of them. We quoted the following from *Stanhope v. Rural High-school District,* 110 Kan. 739, 205 Pac. 648:

"We have often held that irregularities in elections, where there had been departures from directory provisions of the statute, did not vitiate such elections where such irregularities did not frustrate or tend to prevent the free expression of the electors' intentions, nor otherwise to mislead them." (p. 744.)

We went on to hold that the irregularity in failing to designate areas

for the voting places did not affect the validity of the election, noting:

"Here, there is absolutely no showing that any person voted who was not entitled to vote, or that any voter voted at more than one polling place, or that any qualified elector was prevented from voting because of the irregularity." (*West v. Unified School District*, supra, 204 Kan. at 35.)

The same may be said of the record in this case, and we reach the same result.

The second broad category of plaintiffs' contentions includes those characterized by them as "irregularities" which void the election only if shown to have affected the outcome. (See 2 Hatcher's Kansas Digest, Revised Edition, *Elections*, § 13.) In determining these questions we bear in mind that the election carried by 225 votes.

They first complain of noncompliance with the absentee ballot laws. We have already discussed the fact that some thirty people were denied absentee ballots, and therefore *may* have been unable to vote. If this result did obtain it was the result of the statutory deadline, and not the result of any misconduct on the part of the election officer. We are unable to say that this was even an "irregularity."

Another aspect of the absentee voter complaint is based on an organized campaign by the board to "get out the vote," directed in particular at young residents of the district who were away at college. Some 81 requests were made on "behalf" of absentees, as was authorized by K. S. A. 1971 Supp. 25-1122. Of these 43 voted. Except as to seven sons and daughters of board members there was no prior authorization for the applications by the absentee voters. However, specific ratification of the application was later obtained from 35 of the 43 who voted. In addition, the mere act of casting the unsolicited absentee ballot would, in our opinion, constitute a ratification.

We conclude there were no illegal absentee ballots cast. Further, even if all those objected to were void, it would not change the result.

The balance of plaintiffs' complaints may all be put under the heading of "unfair campaign tactics." First, the editor of the local newspaper, having been threatened with a libel action as the result of printing the bond opponents' advertising at the last election, sought the advice of his attorney. He was advised to and did

require an indemnity bond before he would print their ads on this election. They declined to give such a bond, and accordingly were refused newspaper space. Second, a city councilman on his own initiative spoke to two separate groups of city employees, pointing out the need for new school facilities and the probable effect on the city's population if they were not built. The ultimate effect, he said, might be a curtailment of the city's services and budget. Plaintiffs see this as a thinly veiled, coercive threat to the employees' jobs if they failed to vote for the bonds. Third, they complain that the board members took an open stand in favor of the bonds, signing brochures and organizing a block captain campaign. They should, plaintiffs insist, have maintained a detached neutrality—even about a matter entrusted to their official care by the electorate.

Whatever may be the merits of plaintiffs' position on these matters—and we would be hard put to find any substantial merit—there is no showing beyond mere speculation that any of them had any effect on the outcome of the election. Further, as we said of a similar contention in *Humphrey v. City of Pratt*, 93 Kan. 413, 416, 144 Pac. 197, "Unscrupulous campaign methods must be met in some other way than by an action to enjoin issuance and sale of bonds."

It follows that the election was not invalid for any of the reasons asserted, and the district court correctly refused to enjoin the issuance of the bonds. The judgment is affirmed.

APPROVED BY THE COURT.

FATZER, C. J., not participating.