No. 79,284

ANTHONY A. CURE and EMMETT D. AISTRUP, *Appellants,* v.
BOARD OF COUNTY COMMISSIONERS OF HODGEMAN COUNTY,
KANSAS, *Appellee.*

(952 P.2d 920)

Opinion filed
January 23, 1998.

*Carol A. Beier,* of Foulston & Siefkin L.L.P., of Wichita, argued the cause, and
*Boyd A. Byers,* of the same firm, of Wichita, and *Thomas W. Young,* of the same
firm, of Dodge City, were with her on the briefs for appellants.

*Craig S. Crosswhite,* county attorney, argued the cause and was on the brief
for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: This is an election contest based on alleged
violations of the statutory provisions governing advance voting,
K.S.A. 25-1117 *et seq.* On April 1, 1997, the voters of Hodgeman
County said "no" to the question whether corporate hog produc-
tion facilities should be permitted within the geographical bound-
aries of their county. Anthony Cure and Emmett Aistrup (Contes-
tants), voters registered in the county, asked the district court to
set aside the election results and order that the question be resub-
mitted. The district court upheld the election. Pursuant to K.S.A.

25-1450, Contestants appealed to this court for review of the district court's determination.

The question of whether corporate hog production facilities should be permitted within the geographical boundaries of the county was submitted to the voters of Hodgeman County on April 1, 1997. A total of 1,084 votes were cast, 100 advance votes were counted, and the question was defeated by 22 votes.

On April 11, 1997, Contestants filed a notice of contest in the district court, alleging that illegal votes were received, error or fraud occurred in computing the results of the election, and votes not in substantial compliance with the statutes governing advance voting were counted. Contestants alleged that these problems could change the results of the election. They asked the district court to set aside the election results and order the question be resubmitted.

Evidence was presented on April 22. On May 30, 1997, the district court filed its journal entry of judgment in favor of the contestees, the Board of County Commissioners of Hodgeman County. The district court specified the following findings and conclusions:

"(1) That technical errors did occur in the procedures of the Advance Voting Act provisions under K.S.A. 25-1117 *et seq.*;

"(2) That the Court believes that no vote was counted in this election from any unregistered voter;

"(3) That the Court has not heard evidence to support any belief that any vote tampering has occurred in this election;

"(4) That the Contestants' arguments by counsel are on point. However, the Court, because the nature of elections and constitutional rights of voting involved will enter a decision on the side [of] confirming the election absent a clear showing that the standard of review in these cases has not changed from previous case law;

"(5) That the Court determines that the election results of the corporate swine production facility question submitted [on] April 1, 1997 in Hodgeman County, Kansas shall stand as approved by the Board of Canvassers."

Contestants appealed the district court's ruling directly to this court pursuant to K.S.A. 25-1450. On appeal, they do not attack the factual findings of the district court.

In the district court, Contestants alleged that there were at least 64 questionable votes. On appeal, they continue to challenge 47 of those votes.

The issue raised in this appeal is whether the district court should have invalidated the election because of the alleged violations of the advance voting provisions of K.S.A. 25-1117 *et seq*. Contestants contend that 47 illegal advance votes were cast. The election margin was only 22 votes. Thus, the outcome of the election would be affected if more than 22 of the challenged votes were invalidated. Contestants identify three categories of alleged illegality:

1. Thirty-two votes were cast where capable voters were assisted, in violation of K.S.A. 1996 Supp. 25-1124(b); K.S.A. 1996 Supp. 25-1122(b) and (c); K.S.A. 1996 Supp. 25-1123; and K.S.A. 1996 Supp. 25-1124(a).

2. Eleven votes were cast too early, in violation of K.S.A. 1996 Supp. 25-1122(c).

3. Four "absentee" votes were counted where the envelopes were unsigned, in violation of K.S.A. 1996 Supp. 25-1136(b).

Contestants contend that the requirements set out in 25-1122, -1123, and -1124 are mandatory rather than directive. Their contention is based on K.S.A. 1996 Supp. 25-1139, which provides: "No advance voting ballot shall be counted unless marked and transmitted as required by article 11 of chapter 25 of Kansas Statutes Annotated and amendments thereto, except as is otherwise provided in article 12 of such chapter 25." The district court refused to disturb the election result because there was no fraud involved, all voters were eligible, and there was substantial compliance with the statutes. Building on their contention that the statutory provisions for advance voting are mandatory, Contestants argue that the substantial compliance standard applied by the district court would be appropriate only where the alleged irregularities involve nonmandatory provisions of the statutes. In other words, Contestants' position is that in this case where mandatory provisions have been violated, a strict adherence standard must be applied regardless of whether fraud was present.

With regard to its authority in an election contest, this court has stated: "At common law there was no right to contest in court any public election. All election law is created either by the constitution

or by statute." *Lambeth v. Levens*, 237 Kan. 614, 618, 702 P.2d 320 (1985). K.S.A. 25-1117 *et seq.* establish the procedures for advance voting. Any registered voter is eligible to vote by advance voting ballot on all offices and questions submitted. K.S.A. 1996 Supp. 25-1119(a). Advance votes "shall be cast and received and canvassed as provided in this act." K.S.A. 1996 Supp. 25-1119(b). K.S.A. 25-1435 provides, in part: "Any registered voter may contest the determination of the result of any question submitted election at which such voter had the right to vote." The grounds for contest are set out in K.S.A. 25-1436. Contestants base their challenge on subsection (c), which provides in part: "Any contest of election to which K.S.A. 25-1435, and amendments thereto, applies shall be brought on any one or more of the following grounds: . . . . (c) illegal votes were received . . . which could change the result of the election."

In the district court, the parties presented exhibits, witnesses, and arguments. After reviewing the evidence, the district court made the following findings: Technical errors occurred in the procedures of the Advance Voting Act provisions; no vote was counted from any unregistered voter; and no vote tampering occurred in this election. The district court concluded with respect to the law that the test to be applied by a court in an election contest remains as stated by this court in earlier cases, *Lambeth*, for example: "An election irregularity will not invalidate an election unless it is shown to have frustrated or to have tended to prevent the free expression of the electors' intent, or to have otherwise misled them." 237 Kan. 614, Syl. ¶ 2. Applying the principle stated in *Lambeth* to its findings, the district court concluded that the election results should stand.

On appeal, Contestants characterize the statutory procedures for advance voting as mandatory safeguards. They note that this court is not bound by the district court's interpretation of a statute, which is a question of law. See *In re Tax Appeal of Boeing Co.*, 261 Kan. 508, Syl. ¶ 1, 930 P.2d 1366 (1997). Contestants urge the court to require strict adherence to the statutory procedures and to rank the integrity of the election process above the resolution of this one particular election.

The County Commissioners contend that the court should not invalidate an election where there has been substantial compliance with the governing statutes. They quote the following from *Lambeth*:

"A substantial compliance with the law regulating the conduct of elections is sufficient, and when the election has been held and the will of the electors has been manifested thereby, the election should be upheld even though there may have been attendant informalities and in some respects a failure to comply with statutory requirements; mere irregularities should not be permitted to frustrate the will of the voters, nor should the carelessness of election officials. 29 C.J.S., Elections § 214(1). See also *Kimsey v. Board of Education*, 211 Kan. 618, 629, 507 P.2d 180 (1973); and *Brown v. Summerfield Rural High School Dist. No. 3*, 175 Kan. 310, 262 P.2d 943 (1953)." 237 Kan. at 617.

Contestants contend that *Lambeth* and the authorities cited in this excerpt have no application to mandatory election requirements. A careful reading of *Lambeth*, however, reveals otherwise.

In arguing for requiring strict adherence to the statutes, Contestants justify the rigorous standard by characterizing the statutes as mandatory. What they would interpret as mandatory and the effect they would attribute to categorizing a statute as mandatory, however, are not in accord with this court's reasoning in *Lambeth*. Contestants contend that the use of the verb "shall" in a statute makes it mandatory and, therefore, an absolute requirement for any election that will withstand a challenge irrespective of any other considerations. If the statutes governing elections are examined with Contestants' argument in mind, it becomes clear that no election would ever survive judicial scrutiny. Every unvarying aspect of the business of conducting elections is described by the legislature with the verb "shall"; *e.g.*, the Secretary of State shall prescribe the forms, and the forms shall be transmitted to the county election officers 35 days before an election, K.S.A. 1996 Supp. 25-1121; ballot envelopes shall contain a statement guaranteeing confidentiality, K.S.A. 1996 Supp. 25-1120; if voting machines are authorized, the county election officer shall equip his or her office with a sufficient number of voting machines for advance voting voters to use, K.S.A. 1996 Supp. 25-1122a; a list of advance voting voters shall be given to the supervising judge with the voting sup-

plies, and if additional advance voting ballots are received, those voters names shall be promptly added to the list, K.S.A. 1996 Supp. 25-1126. Examination of the statutes also shows that the legislature spelled out what acts were to be punishable as unlawful acts. K.S.A. 1996 Supp. 25-1128 makes it a class C misdemeanor for any voter to vote more than once, for an unregistered voter to vote, or for any person willfully to falsify a declaration form. These are willful commissions that jeopardize the integrity of the election. In contrast, "violations" of the statutes prescribing protocol could be, and seem to be in the present case, unwitting omissions. Thus, the better view seems to be that the verb "shall" in the statutes at issue indicates that the legislature expects the protocol to be followed and that it was not merely passing time by drafting and enacting the legislation, but that failure to dot all the i's does not constitute illegal conduct or invalidate an election.

Contestants note that 29 C.J.S., Elections § 214(1), is cited by this court in *Lambeth*. They derive their theory of the distinction between violations of directory and of mandatory provisions of election laws from the discussion at 29 C.J.S., Elections § 214(2), pp. 606-09, where it is stated:

"The difference between mandatory and directory provisions of election statutes lies in the consequence of nonobservance; an act done in violation of a mandatory provision is void, whereas an act done in violation of a directory provision, while improper, may nevertheless be valid. . . . Statutes giving directions as to the mode and manner of conducting elections will be construed by the courts as directory, unless a noncompliance with their terms is expressly declared to be fatal, or will change or render doubtful the result, as where the statute merely provides that certain things shall be done in a given manner and time without declaring that conformity to such provisions is essential to the validity of the election. Generally, a voter is held to strict, or substantial, compliance with regulations laid down for his own guidance, but is not disfranchised for the noncompliance of other persons with rules laid down for their guidance.

". . . If the statute simply provides that certain acts or things shall be done in a particular time or in a particular manner, without declaring that their performance is essential to the validity of the election, they will be regarded as mandatory if they affect the actual merits of the election, and they will be regarded as directory if they do not.

. . . .

"[I]t has been held that many election regulations which are mandatory, and may be enforced, before the election are not mandatory, or are merely directory,

after the election, and that the provisions of the election laws are mandatory if enforcement is sought before the election. . . . [Thus], a statute prescribing the duties of election officers may be held either mandatory or directory according to the time and manner in which it is questioned; before election it is mandatory if direct proceedings for its enforcement are brought, but after election it should be held directory, in support of the result, unless of a character to effect an obstruction to the free and intelligent casting of the vote, or the ascertainment of the result, or unless the provisions affect an essential element of the election, or it is expressly declared by the statute that the particular act is essential to the validity of the election, or that its omission will render it void. In short, after an election has been held and the voters have spoken, the election will not be held invalid and the voice of the people thwarted in the absence of fraud, prejudice, or definite legislative pronouncement thereon."

The Kansas cases cited in Corpus Juris Secundum for the quoted principles are: *Brown v. Summerfield Rural High School Dist. No. 3*, 175 Kan. 310, 262 P.2d 943 (1953); *State v. Tipton*, 166 Kan. 145, 199 P.2d 463 (1948); and *Hooper v. McNaughton*, 113 Kan. 405, 214 Pac. 613 (1923). All are cited in *Lambeth*.

In *Brown*, a taxpayer contested an election in which the majority favored issuing bonds for the purpose of building a new school. The contestant objected to the absence of voting booths where ballots could be marked in private. The court concluded that the law did not require booths for the bond election. 175 Kan. at 314. The court further noted that the contestant had not alleged that the outcome of the election was affected by the lack of privacy. 175 Kan. at 315-16.

*Tipton* was a proceeding in mandamus to compel the clerk of Morton County to place John Hardwick's name on the general election ballot as a Republican nominee for county commissioner. The county clerk declined to print Hardwick's name on the general election ballot as a Republican nominee on the ground that, as a registered Democrat, he was ineligible for the Republican nomination. The court found nothing in the election statutes that precluded a member of one party from receiving the nomination of another. Moreover, the court indicated that it would not interfere with the substantial election rights of the public on account of an irregularity in the procedure. 166 Kan. at 149-50.

*Hooper*, like *Brown*, involved a statute intended to ensure secrecy in balloting, and, as in *Brown* and *Tipton*, the court upheld the election results even though some of the statutory formalities had not been observed. The unsuccessful candidate for county attorney contended that ballots from the Soldiers' Home should have been excluded from the count because some of the elderly and infirm residents did not fold their ballots so as to conceal the marks on them. After defining mandatory and directory provisions relative to one another, the court stated:

"The primary object of an election law, which transcends all other objects in importance, is to provide means for effective exercise of suffrage. Secrecy is subsidiary, a means to that end. To vitiate a ballot, disregard of secrecy must be so mischievous as to warrant disfranchisement. To insure secrecy, the statute requires that the curtains of voting booths must come to within two feet of the floor of the polling place. No one would contend that, if the curtain of one of a number of booths at a precinct should, through inadvertence, be six inches short, the election at that precinct would be void. . . . When the legislative intention is not so plain, whether nonobservance of a regulation avoids a ballot, depends on the intimacy of the relation between the regulation and the general purpose to be accomplished, and the nature and extent of the departure. Generally, a voter may be held to strict compliance with rules laid down for his own guidance. Generally, he is not disfranchised for nonconformity by others with rules laid down for their guidance." 113 Kan. at 407.

The other case cited in *Lambeth* is *Kimsey*, and, according to Contestants, it does not involve mandatory statutory provisions. The court stated:

"In question is an election held February 26, 1972, at which the bond proposition carried by a vote of 1388 for, to 1163 against. Plaintiffs claim several procedural deficiencies and irregularities, some of which they assert are serious enough, standing alone, to invalidate the election, and some of which they concede must be shown to have affected the outcome. We accept this classification of their claims and shall treat them accordingly." 211 Kan. at 620.

After thorough discussion of plaintiffs' claims, the court concluded that "the election was not invalid for any of the reasons asserted." 211 Kan. at 630. The primary contention was that the board of education had not satisfied the following mandatory requirement: "The board shall adopt a resolution stating the purpose for which bonds are to be issued and the estimated amount thereof." K.S.A.

1971 Supp. 72-6761. The court was unconvinced: "[T]he record shows substantial compliance with the statute, particularly in light of its purpose and function." 211 Kan. at 620.

Review of the general principles, as stated in the treatise, and the principles applied by Kansas courts in election contests does not support the position of either a crisp distinction between mandatory and directory election provisions or a mechanical characterization of the provisions at issue. It suggests, instead, a practical approach focusing on the purpose of the statute and the question whether the challenged act or omission impeded voters in exercising their voting rights.

This court's opinion in *Lambeth* is not only instructive, but controlling. In Contestants' concentration on mandatory versus directory provisions, they have ignored the lessons of *Lambeth*. The first of those lessons is that an election contest in the courts of this state is controlled by the statute or statutes that authorize what judicial relief can be granted. The key passage in *Lambeth* on this principle is the following:

"An election cannot be declared void unless such relief is authorized by law since there is no inherent power in the courts to pass on the validity of elections. An election cannot be declared void where a statute otherwise limits and prescribes the duties of the court on the trial of a contest. Since the legislature has determined when the courts may order a new election, the courts are limited to those remedies." 237 Kan. at 621.

The statutes governing the conduct of voters or election officials and other election matters cannot control the remedy. Allegations of specific irregularities or illegalities are to be considered and determined according to the pertinent statutory provisions, but, once the determination is made, its effect is controlled by the statute or statutes that authorize what judicial relief can be granted. In this regard, the categorization of conduct or votes as illegal or not is the key. The distinction between mandatory and directory provisions is lightly applied, if at all.

Applying the fundamental principle that its authority to grant relief is prescribed and proscribed by legislation where elections are concerned, the court in *Lambeth* formulated its ruling on that

basis. The court looked to K.S.A. 25-1436 (Ensley 1981) and K.S.A. 25-1448 (Ensley 1981), which then stated in pertinent part:

"Any contest of election to which K.S.A. 25-1435 applies shall be brought on any one or more of the following grounds:

(a) The person to whom a certificate of election was issued was ineligible to hold such office at the time of the election.

(b) some voters were deprived of the right of voting for a candidate or on a question submitted, when such voters had the right under the election laws of this state to vote thereon, and such deprival could change the result of the election;

(c) illegal votes were received or legal votes were rejected which would change the result of the election;

(d) error or fraud occurred in computing the results of the election which would change the result of the election;

(e) the person to whom the certificate of election was issued offered or gave, or caused to be offered or given, a bribe to any person charged by law with any election duty, for the purpose of procuring such person's election; or

(f) any other cause which shows that another was the person to whom the certificate of election for such office should have been issued." K.S.A. 25-1436 (Ensley 1981).

"[I]n case of an appeal, upon the final judicial determination of the contest, if the contestant succeeds in the contest, the court may invalidate and revoke any election certificate which has been issued to the contestee, and the secretary of state or county election officer authorized to issue the certificate of election shall issue the certificate to the person the court finds is entitled thereto; except that in cases where the court has found that the contestant prevails in the contest on the grounds provided for in subsection (a), (b), or (e) of K.S.A. 25-1436, then the court may order another election for such office to be held within thirty (30) days after the date of such order or may make such other orders as the court deems appropriate." K.S.A. 25-1448 (Ensley 1981).

The allegation that had possible merit was that Alta Lewis had cast an illegal absentee ballot. Because the district court had not determined whether the absentee ballot marked by Alta Lewis for her husband was illegal, the matter was remanded for that determination. Its legality depended on whether she cast the absentee vote in accordance with her husband's wishes; if not, she in effect voted twice in violation of K.S.A. 25-2416(b), which made it illegal to vote more than once in the same election. K.S.A. 25-1448 (Ensley 1981) did not authorize the court to order another election on the ground that an illegal vote was received which would change the result of the election, 25-1436(c). This court's direction to the

district court, therefore, included the following: "[I]f the illegal vote was cast for Lambeth and the election then results in a tie, Levens shall be declared elected sheriff of Hamilton County having been previously selected by lot." 237 Kan. at 623. Although the contestants had made much of Alta Lewis' failure to furnish an affidavit attesting that she assisted in marking the absentee ballot, as required by K.S.A. 1984 Supp. 25-1124(c), the court concluded that the allegation did not merit consideration because her conduct "did not frustrate, prevent free expression or mislead others." 237 Kan. at 617.

Contestants in the present case insist that *Lambeth* is not controlling precedent because it did not involve mandatory provisions. It appears that they may be referring to the statutory provisions requiring a person who assisted a disabled voter to furnish an affidavit. That provision, K.S.A. 1984 Supp. 25-1124(c), exhibited the language that Contestants point to in arguing that the statutes at issue here are mandatory, that is, the verb used is "shall." K.S.A. 1984 Supp. 25-1124(c) provided:

"The county election officer shall allow a person to assist a sick, physically disabled or illiterate voter in marking and transmitting an absentee ballot, provided an affidavit is signed by the person who renders assistance to the sick, physically disabled or illiterate voter and submitted to the county election office with the absentee ballot. The affidavit shall be on a form prescribed by the secretary of state and shall contain a statement from the person providing assistance that the person has not exercised undue influence on the voting decision of the sick, physically disabled or illiterate voter and that the person providing assistance has marked the ballots as instructed by the sick or physically disabled voter."

It may also be noted that K.S.A. 1984 Supp. 25-1124(d) made it a felony to knowingly and willfully fail to furnish the affidavit. As Contestants assert, this court did not regard these statutory provisions as being mandatory. This hardly helps Contestants' cause, however, because the provisions are quite comparable to the ones Contestants call mandatory for the purpose of the present case. Moreover, violation of these statutes was not a basis for disturbing the election results; the statutory violation that was regarded as a possible basis for overturning the election made voting twice an illegal act.

All the statutory provisions at issue in the present case are part of the Advance Voting Act, which permits any registered voter to vote before the scheduled election, on a temporary or a permanent basis. An application for an advance voting ballot is to be accompanied by an affirmation of eligibility. Advance voters may obtain their ballots by mail or in person in the office of the county election officer. Advance voting ballots received by mail are to be returned to the county election officer in a sealed ballot envelope bearing the same number as the ballot. Any sick, physically disabled, or illiterate voter may receive assistance in applying for an advance voting ballot, marking it, and transmitting it. When returned to the county election officer, the ballot must be accompanied by the statement of the person who rendered assistance to the effect that he or she did not exert undue influence on the voting decision and that he or she marked the ballot according to the voter's instructions.

We first consider Contestants' allegation that 32 votes were illegal because capable voters received ballots from third persons. In the statement of facts in their brief, Contestants assert that "at least 32 voters who received assistance with their advance ballots were neither sick, physically disabled, nor illiterate" and that "ballots were transmitted to these voters through third parties" rather than in person or by mail. Part of the record consists of 34 photocopies of a form titled "Application for Advance Voting Ballot on Behalf of an Elector," which were introduced at trial as Contestants' Exhibit 2. Everett Beltz, County Clerk of Hodgeman County, was asked if he knew "whether any of the voters identified in that exhibit are sick, physically disabled or illiterate?" He answered, "Well, I don't think so, no." He testified that he mailed two advance voting ballots for which there were applications. Beltz also testified that the advance voting ballots were given to the person who signed the application form. In each instance, the applicant is a different person from the advance voter. Examination of the application forms shows that in one instance the ballot was given to someone other than the person who signed the application form, but it still was given to someone other than the advance voter. It also shows that in nearly every case it was noted on the application form to

whom the ballot was given. In other words, there does not seem to have been any effort at deception. Nine of the application forms do not bear any notation indicating that the advance voting ballots that were given to someone other than the voter ever were returned to the election official, *i.e.*, 9 of the 32 at issue. In other words, there may not be as many votes at issue as Contestants claim.

By comparing the evidence with Contestants' assertions, it becomes apparent that they have overstated their case. What is established by the record is that 23 advance voters received their ballots from third persons rather than from an election official or through the mail. What is not established is whether any of them received assistance in marking his or her ballot, and, if so, whether they were sick, physically disabled, or illiterate. With respect to the latter, Beltz testified broadly that he did not think that any were in that category, but he did not pretend to have personal knowledge about each.

Contestants contend that K.S.A. 1996 Supp. 25-1123 and -1124(a) require advance voting ballots to be mailed to the voters if the voters do not pick them up in person from the election official. We note that 25-1123 actually applies "[w]hen an application for an advance voting ballot has been filed in accordance with K.S.A. 25-1122." Examination of K.S.A. 1996 Supp. 25-1122 reveals no mention of applications made on behalf of an elector. K.S.A. 1996 Supp. 25-1124(b) and (c) permit any sick, physically disabled, or illiterate voter to be assisted in applying for an advance voting ballot. It would not be unreasonable to infer that a voter who is not sick, physically disabled, or illiterate is not eligible for assistance, but the statutory scheme does not include any express prohibition.

Contestants urge the court to look at a subsection that was added to K.S.A. 1996 Supp. 25-1128 during the 1997 legislative session, but was not effective at the time of the contested election. The referenced section states: "No person, unless authorized by K.S.A. 25-1122 or K.S.A. 25-1124, and amendments thereto, shall intercept, interfere with, or delay the transmission of advance voting ballots from the county election officer to the voter." L. 1997, ch.

124, § 4(c). This statute does not appear to be aimed at transmission, with the voter's permission, of an advance voting ballot from the county election officer to the voter. There is nothing in the record of the present case from which the court could find that there had been interception, interference, or delay in the transmission of any of the advance voting ballots at issue. Thus, even if the statute had been in effect at the time of the Hodgeman County election, it would not seem to have any direct or indirect application to the circumstances alleged or established in the present case.

With regard to the issue of assisting voters, Contestants contend that *Lambeth* "stand[s] squarely for the interpretation that assisted votes cast by persons not entitled to assistance are illegal and not properly counted." This proposition is not supported by *Lambeth*. The voter who was assisted in that case, Alta Lewis' husband, at the very least required assistance and may actually not have had the capacity to understand what he was being assisted with. There was no question of entitlement to assistance. The question was whether Alta Lewis assisted her husband by marking his ballot according to his preference or whether she cast her own vote twice by marking both her own ballot and his as she preferred.

Finally, Contestants cite several out-of-state cases and rely rather heavily on one from Mississippi, *Lewis v. Griffith*, 664 So. 2d 177 (Miss. 1995). In that case, the Mississippi Supreme Court overturned an election on the basis of " 'a total departure from the fundamental provisions of the statute [so] as to destroy the integrity of the election and make the will of the qualified voters impossible to ascertain.' " 664 So. 2d at 186 (quoting *Riley v. Clayton*, 441 So. 2d 1322, 1328 [Miss. 1983]). *Lewis* involved a municipal election where the declared winner had a total of 116 votes and the loser had 115 votes. At issue were three absentee ballots, which were hand-delivered to her able-bodied relatives by the town clerk when absentee ballots were not available to other citizens. Although the result seems to be clear-cut, we note that the court was quite fragmented. Three justices concurred without a separate written opinion, two other justices filed a concurring opinion, and three other justices filed a separate written dissenting opinion. See 664 So. 2d at 189. The dissenting justices emphasized that there was no evi-

dence of fraud, misconduct, or other intentional wrongdoing and that in the only Mississippi case on point the court refused to invalidate an election based solely on technical irregularities. 664 So. 2d at 190 (Smith, J., dissenting). In other words, what little precedential value a Mississippi case interpreting statutes of that state might have for the present case is further diminished by the disagreement within the Mississippi court.

In any event, assisting an able-bodied voter in applying for an advance voting ballot is not among the unlawful advance voting acts set out in K.S.A. 1996 Supp. 25-1128, which provides:

"(a) No voter shall mark or transmit to the county election officer more than one advance voting ballot, or set of one of each kind of ballot, if the voter is entitled to vote more than one such ballot at a particular election.

"(b) No person, unless authorized by K.S.A. 25-1119 and amendments thereto, shall mark, sign or transmit to the county election officer any advance voting ballot or advance voting ballot envelope.

"(c) No person shall willfully and falsely affirm, declare or subscribe to any material fact in an affirmation form for an advance voting ballot, or set of advance voting ballots if the voter is entitled to vote more than one kind of advance voting ballot at a particular election, or in a declaration form on an advance voting ballot envelope.

"(d) Nothing in this section shall be construed to prohibit any person from mailing, carrying or otherwise conveying advance voting ballots or sets of advance voting ballots to the county election officer upon request of advance voting voters.

"(e) Violation of any provision of this section is a class C misdemeanor."

With no express statutory prohibition on third persons transmitting advance voting ballots to advance voters and no categorization of this conduct as unlawful or illegal, there is no merit in Contestants' complaint. At best, their complaint is analogous to the charge in *Lambeth* that Alta Lewis failed to furnish an affidavit about assisting her ailing husband in marking his ballot. Here, the complained-of conduct does not constitute an illegal act. The district court was correct in finding such violations did not require that the election be invalidated.

Contestants next contend that 11 votes were cast too far in advance of the election, that is, before the time specified in K.S.A. 1996 Supp. 25-1122(c). K.S.A. 1996 Supp. 25-1122 provides, in part:

"(a) Any person described in K.S.A. 25-1119, and amendments thereto, may file with the county election officer where such person is a resident, or where such person is authorized by law to vote as a former precinct resident, an application for an advance voting ballot.

"(b) Applications for advance voting ballots to be transmitted to the voter by mail shall be filed only at the following times:

. . . .

(4) For the general election occurring on the first Tuesday in April, between January 1 of the year of such election and the last business day of the week preceding such general election.

(5) For question submitted elections occurring on the date of a . . . general election, the same as is provided for ballots for election of officers at such election.

. . . .

"The county election officer of any county may receive applications prior to the time specified in this subsection (b) and hold such applications until the beginning of the prescribed application period. Such applications shall be treated as filed on that date.

"(c) Except as otherwise provided in subsection (e), applications made by persons specified in K.S.A. 25-1119, and amendments thereto, for advance voting ballots to be transmitted to the voter in person in the office of the county election officer shall be filed only on the Tuesday next preceding the election, or such earlier date as the county election officer may designate, on each subsequent business day and, if the county election officer so provides, on Saturday, until no later than 12:00 noon on the day preceding such election. Upon receipt of any such application, properly executed, the county election officer shall deliver to the voter such ballots and instructions as are provided for in this act."

As a practical matter, an application for an advance voting ballot that will be given to the voter in person in the office of the county election officer and the advance voting ballot will be completed by the voter during the same visit to the election officer's office. Thus, for the purpose of determining when balloting is permitted, Contestants seem to use "application for a ballot" and "a ballot" synonymously. K.S.A. 1996 Supp. 25-1119, which is referred to in portions of the statute quoted above, provides:

"(a) Any registered voter is eligible to vote by advance voting ballot on all offices and to vote by advance voting ballot on questions submitted on which such elector would otherwise be entitled to vote.

"(b) The votes of such electors shall be cast and received and canvassed as provided in this act."

Eleven persons received their ballots and voted in the office of the county election officer (rather than having their ballots mailed

to them) before March 25. The first was Gerald Pitts, who voted in the office on March 13, 1997. Everett Beltz, the Hodgeman County election officer, testified that he did not publish a notice of the date on which advance voting would commence in his office.

It is Contestants' contention that, absent Beltz' giving notice of an earlier date, the earliest possible time when advance balloting was allowed under the statute was March 25, 1997, the Tuesday preceding Tuesday, April 1, 1997, the day of the election. A plain reading of the statute, however, does not support their interpretation. There is no statutory prohibition on advance votes being cast more than a week before the election. K.S.A. 1996 Supp. 25-1122(c) permits them to be cast at any time upon or after designation by the county election officer, and the method of designation is neither specified nor qualified. In those circumstances, it seems as if the election officer designates the date on which applications will begin to be taken when a registered voter visits the election officer's office and becomes the first person allowed to complete an application for an advance voting ballot and to cast his or her ballot in any given election. In this case, Gerald Pitts completed an application for an advance voting ballot and voted in the election officer's office on March 13, 1997. By his action, the election officer effectively designated March 13 as the earliest date on which he would take applications for advance voting ballots to be handed to the voter, rather than mailed, for the question submitted election of April 1, 1997. The election officer's discretion to designate when applications will be accepted probably should be tempered with a reasonableness requirement. After all, someone who voted too far ahead might not have the benefit of all the information made available during the campaign.

Contestants argue that a public notice is required in order for the election officer to designate an early date for accepting applications for advance voting ballots. They contend that any other rule would create "an uneven playing field where the rules of the election are defined on a voter-by-voter basis at the whim of the election officer." This argument might carry some weight if, for example, there were evidence that Everett Beltz' acceptance of Gerald Pitts' application had been preceded shortly by his refusal

of another. In such a case, the reasonableness of the designation might be in question. In the present circumstances, it is not. Where there is no evidence of differential treatment, similarly situated voters are not on an uneven field.

Finally, Contestants challenge four "absentee" votes. The record contains four manila envelopes with the words "absentee ballot" printed on them, which appeared to have been sealed at one time and then opened. The printed "Declaration of Absent Voter," which appears on each envelope and is to be completed and signed, is blank on each of these four envelopes.

Contestants complain that the votes were counted in spite of "[a]t least four of the [advance voting] ballot envelopes produced at trial lack[ing] the signature of the voter." They contend that, instead of counting the votes, the election officer should have marked the envelopes as "provisional" and placed them in a separate sealed container. Contestants cite K.S.A. 1996 Supp. 25-1136, which provides:

"(a) The vote of any advance voting voter may be challenged in the same manner as other votes are challenged, as nearly as may be, and the judges of the special election board shall determine the validity of each advance voting ballot. Whenever the judges determine that the form accompanying an advance voting ballot is insufficient, or that the voter is not a registered voter, or the challenge is otherwise sustained, the advance voting ballot envelope shall not be opened. In all such cases, the judges shall endorse on the back of the envelope the word 'provisional' and state the reason for sustaining the challenge.

"(b) Any advance voting ballot envelope which has not been signed shall not be opened, and no vote on the ballot therein shall be counted. Such envelope or ballot shall be challenged in the same manner in which other votes are challenged.

"(c) Whenever it shall be made to appear to the judges of a special election board by sufficient proof that an advance voting voter has died, the envelope containing the advance voting ballot of such deceased voter shall not be opened. In all such cases, the judges shall endorse on the back of the envelope the word 'provisional' and the reason for sustaining the challenge.

"(d) If objection is made to an advance voting ballot because of form, condition, or marking thereof, the ballot shall be marked 'void' if the judges uphold the objection to the entire ballot, and otherwise shall be marked on the back thereof, 'objected to' with a statement of the substance of the objection.

"(e) Void, provisional and objected to advance voting ballots shall be transmitted to the county election officer in the same manner as personally cast provisional ballots are transmitted but shall be placed in separate envelopes or sacks, appro-

priately labeled and sealed. Votes contained in void and provisional advance voting ballots shall not be included in the total of votes certified by the special election board. Void, provisional and objected to advance voting ballots shall be reviewed by the board of county canvassers, and such board shall finally determine the acceptance or rejection of each void, provisional or objected to ballot."

What Contestants do not address is the correct timing of a challenge to an advance voting envelope or ballot on the basis of an unmarked or insufficiently marked envelope. The statute contemplates that the judges of the special election board will determine the merit of a challenge. If a challenge is sustained, they are to indicate so by marking the envelope. It is then to be transmitted to the county election officer. Because of the successful challenge, the special election board's certified vote totals should not include the votes from the envelopes. Final determination whether to count the votes is to be made by the board of county canvassers upon review of the envelopes marked by the judges of the special election board. There is no indication in the present case that any timely challenge or objection was made to the four unmarked envelopes.

Just as departures from the statutory procedure for advance voting should not routinely result in judicial overturning of election results, departures from the statutory procedure for challenging advance votes should not automatically invalidate the challenge. The importance of the statutorily prescribed procedures for both, though, is illustrated by the evidence in the record in the present case. As a result of the departures, the record is wholly inadequate. What the record contains is four manila envelopes, blank except for the preprinted material. Each appears to have been sealed and then opened. Each is empty. If there is testimony identifying these particular envelopes as having contained completed ballots, it has not been brought to our attention. In its absence, there is no way of knowing whether these envelopes ever contained ballots. These envelopes do not provide a basis upon which the court could invalidate four votes. In any event, the invalidation of four votes would have no effect on the outcome of the election, which was decided by a 22-vote margin.

Contestants contend that the county election officer's destruction of election materials earlier than allowed by statute should be "an additional basis" for the court's invalidating the election. K.S.A. 1996 Supp. 25-2709 provides: "The following election records may be destroyed after they have been on file for the period stated: . . . (6) Affidavits required to be filed by the election laws of the state of Kansas, including advance voting and mail ballot envelopes containing voters' declarations, two years." According to Contestants' calculations, there should have been 59 advance voting ballot envelopes retained by the county election officer in this case, but "21 days after the election, only 24 advance ballot envelopes could be located." Contestants urge the court to "adopt a bright line rule condemning the unlawful destruction of election records and requiring new elections where such destruction compromises confidence in the outcome of an election."

At trial, Beltz, the county election officer, was asked if he had kept the envelopes. He testified that he had not, that instead he had given "them to Mrs. Baldwin for her—where she keeps history and she stores her stuff in those envelopes." Then the following exchange occurred between counsel for Contestants and Beltz:

"Q. Did you give all the envelopes to Mrs. Baldwin?

"A. No, I think—not all of them, because she didn't ask for them just a few days before the election. She wanted them so I saved them all.

"Q. So, is it your testimony that all of the ballots that were mailed back to you, you gave to Mrs. Baldwin?

"A. No, I'm not saying that, because I don't know for sure.

"Q. What happened to the envelopes that came back to the office that you said you let people take them out and put in the machine?

"A. Well, just let them put them in the trash can because I didn't think—they voted them right there.

"Q. Do you know you're supposed to maintain those envelopes?

"A. I think I probably am.

"Q. Do you know for how long [you're] supposed to keep those envelopes?

"A. I heard somebody say two years.

"Q. That was probably me in my opening statement."

In his brief, the Hodgeman County Attorney identifies Mrs. Baldwin as "a local genealogist" to whom the envelopes were given "for the purpose of storing newspaper clippings."

There is no question that the practices of the Hodgeman County election officer were sloppy, but there is no allegation and certainly no evidence of vote tampering in this case. The election officer's providing the local historian with envelopes in which to store her source material is not the sort of conduct that sets off alarms. There is no statutory sanction for election materials' being destroyed before the period specified in 25-2709 has passed. Contestants characterize the election officer's failing to retain the envelopes as "the unlawful destruction of election records," but they have not directed the court's attention to any statutory penalty for it. We cannot condone the lack of professionalism of the election officer, and the county officials should take positive steps to cure the deficiencies. Nonetheless, we adhere to the policy expressed in *Lambeth* of upholding election results in the absence of fraud or conduct declared by the legislature to be illegal; thus, the outcome of the election must be confirmed.

Contestants predict that "[a]nything short of reversal will signal that a clear legislative mandate means nothing and that election safeguards depend upon the fancy of individual election officers rather than rules of law." We find no justification for such a bleak view. It reflects their position, which has not been shared by this court in election contest appeals, that the court-imposed sanction for each and every departure from prescribed election procedures ought to be election invalidation. Their position, as noted earlier in this opinion, ignores the absence of statutory authority for the court to invalidate the results of an election as a means of enforcing procedural rules. Their position depends in large measure on the mandatory language, *i.e.*, the verb "shall," in the procedural statutes. One of the principal purposes the legislature intended to serve by formulating the procedures undoubtedly was the safeguarding of the integrity of elections. To this end, the legislature framed the procedures in mandatory terms. It intended for the procedures to be followed by state and local election officials. That the legislature did not intend for incidental procedural departures to result in elections being overturned where there was no evidence of fraud can be seen in the absence of enforcement provisions. The legislature's lack of attention to creating sanctions for purely pro-

cedural departures stands in contrast to its delineation of unlawful acts and penalties, for example, K.S.A. 1996 Supp. 25-1128. Here, there were no violations of the provisions of the Advance Voting Act that prevented a Hodgeman County voter from exercising his or her right to vote.

The judgment of the district court is affirmed.

LOCKETT, J., not participating.

RICHARD W. WAHL, Senior Judge, assigned.