2001-NMSC-028

31 P.3d 1008

**Narendra GUNAJI and Maria S. Sutton, Plaintiffs–Appellants–Contestants,**

v.

**Fernando MACIAS, Gilbert Apodaca, and Rita Torres, County Clerk, Defendants–Appellees–Contestees.**

No. 25,896.

Supreme Court of New Mexico.

Sept. 12, 2001.

Martin, Lutz, Roggow & Brower, P.C., William Lutz, Las Cruces, NM, for Appellants.

Law Offices of Xavier Acosta, Xavier E. Acosta, Hubert & Hernandez, P.A., Lee Peters, Sandenaw, Carrillo & Piazza, P.C., Raul A. Carrillo, Jr., Las Cruces, NM, for Appellees.

## OPINION

MAES, Justice.

{1} This election contest raises the issue whether a new election must be held where in a given precinct, an error by the County Clerk caused a number of invalid votes to be cast greater than the margin of victory in that precinct. We hold that while the election was not "free and open" under article II, § 8 of the New Mexico Constitution, the proper remedy is to draw an analogy from a section of the Election Code covering cases closely related to the instant one, meaning the votes in the precinct in issue are to be rejected.

*I. FACTS AND STANDARD OF REVIEW*

{2} This is an election contest involving the November 5, 1996 general elections in State Senate District No. 38 and Dona Ana County Commissioner District No. 5. In the Senate District, the Democratic candidate was Contestee Fernando R. Macias and the Republican candidate was Contestant Narendra N. Gunaji. For County Commissioner, the Democratic candidate was Contestee Gilbert T. Apodaca and the Republican candidate was Contestant Maria S. Sutton. On election day, an incorrect ballot face was discovered on machine number 4719 at Precinct 31 in Dona Ana County. The ballot face contained two errors. First, it showed the State Senate race as between Mary Jane Garcia as the Democrat and Thomas Bulger as the Republican. Second, instead of listing the candidates for County Commissioner in District No. 5, it incorrectly listed the race for Dona Ana County Clerk (Rita Torres, unopposed).

{3} Sixty-six voters cast their votes using the wrong ballot face on machine number 4719. If any of the sixty-six voters who used the incorrect ballot face voted for the Democratic candidate for State Senate listed on the ballot face, Mary Jane Garcia, the votes were credited to Macias even though his name was not on the ballot face. The same held true for Gunaji if any votes among those initial sixty-six voted for the Republican candidate for State Senate listed on the ballot face. A similar situation was occurring in the race for County Commissioner. The error was discovered on election day, but the response of the election officials only compounded the problem. Although they replaced the flawed ballot face with a correct ballot face, machine 4719 remained in use, and 112 more people cast votes after the flawed ballots were replaced. The votes of the sixty-six persons using the wrong ballot face were commingled with the votes of the persons using the correct ballot face.

{4} The official results for the race for Senate District No. 38 were 5,297 votes for Contestee Macias and 5,286 votes for Contestant Gunaji, a difference of eleven votes. The official results for the race of County Commissioner District No. 5 were 4,507 votes for Contestee Apodaca and 4,409 votes for Contestant Sutton, a difference of ninety-eight votes. Therefore, it appears for both races that a swing vote of sixty-six (or fewer) votes away from the winner and in favor of the loser could have turned the election around. That is, it is possible that all sixty-six voters voted for the winner but would have voted for the opposite candidate had the ballot face been correct throughout the election.

{5} The final official vote total from Precinct 31 for the Senate race was 205 for Gunaji and 159 for Macias. The final official vote total from Precinct 31 for County Commissioner was 185 for Apodaca and 160 votes for Sutton. Thus, if the votes in Precinct 31 were omitted as a whole from the overall totals, the results would be unchanged.

{6} There was also an issue concerning absentee ballots. Four absentee precincts included voters in Senate District No. 38 and County Commissioner District No. 5. There were twenty-four more votes than there were voters in the absentee precincts that affected this race, as well as thirty incorrect ballots. Because the parties have abandoned any issues of absentee ballots in their briefs, we do not discuss them.

{7} Count I of Contestants' complaint was an election contest. Count II sought a declar-

atory judgment as to whether the elections were valid in view of the irregularities. Count III alleged a civil rights violation against the County Clerk, who removed the matter to federal court pursuant to 28 U.S.C. § 1441 (1991). The United States District Court dismissed Count III and remanded the action to state court. The trial court granted summary judgment on Count I. Contestees' motion to dismiss was granted on Count II, the court holding, "Contestants are not entitled to the equitable relief sought in the context of an election contest as a matter of law." **RP 532.**

{8} The standard of review is de novo. We said in *Hasse Contracting Co., Inc. v. KBK Financial, Inc.,* 1999–NMSC–023, ¶ 9, 127 N.M. 316, 980 P.2d 641: "Summary judgment is appropriate when . . . the parties do not dispute the facts, but only the legal effect of those facts . . . In such cases, the district court determines as a matter of law which movant is entitled to summary judgment . . . Appellate courts review matters of law *de novo*." The same reasoning applies to review of the grant of a motion to dismiss where all that is before the court are pleadings and affidavits. *CABA Ltd. Liability Co. v. Mustang Software, Inc.,* 1999–NMCA–089, ¶ 9, 127 N.M. 556, 984 P.2d 803.

## II. MOOTNESS

{9} Noting that the terms of the offices in issue have expired, Contestees argue that the case is moot and that this Court should therefore dismiss the appeal. As a general rule, this Court does not decide moot cases. *Mowrer v. Rusk,* 95 N.M. 48, 51, 618 P.2d 886, 889 (1980). A case is moot when "no actual controversy exists," *id.,* and the court cannot grant "actual relief." *Atchison, Topeka & Santa Fe Ry. Co. v. State Corp. Comm'n,* 79 N.M. 793, 794, 450 P.2d 431, 432 (1969). Accordingly, an election contest becomes moot when the term for the corresponding office expires. *See Arellano v. Chacon,* 1 N.M. 269, 270 (Gild.1859). *See also State v. Vogel,* 39 N.M. 122, 123–24, 41 P.2d 1107, 1108–09 (1935) (holding judgment of removal from office is moot if official's term of office would expire shortly after removal); *State ex rel. Hughes v. McNabb,* 38 N.M. 92, 92, 28 P.2d 521, 522 (1933) (holding mandamus proceeding is moot where, among

other factors, official against whom mandamus was sought is no longer in office). The terms of office in this case have expired, so the case is moot.

{10} However, this Court may review moot cases that present issues of substantial public interest or which are capable of repetition yet evade review. *Johnson v. Francke,* 105 N.M. 564, 564 n. 1, 734 P.2d 804, 804 n. 1 (Ct.App.1987); *Mowrer,* 95 N.M. at 51, 618 P.2d at 889. This case presents such issues. Contestants argue that the mistakes on the ballot face resulted in an election that was not "free and open" as required by article II, § 8 of the New Mexico Constitution and that the proper remedy is a new election. This argument raises issues of substantial public interest. First, does the Election Code provide the exclusive means of contesting an election in New Mexico or are there other means of contesting an election? Second, what is the proper remedy when the number of votes cast on an incorrect ballot face is high enough to have potentially changed the outcome of the election? These issues are also capable of repetition. Human error cannot be eliminated from the election process, so election contests based on incorrect ballot faces are likely to arise again in New Mexico. Moreover, these issues may evade review because terms of office may expire before this Court decides them.

{11} Contestees argue that in order for an issue to be capable of repetition, the specific contests must be likely to occur again. Although this is a requirement under federal law, *see Weinstein v. Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975), there is no such requirement in New Mexico. Therefore, contrary to Contestee's contentions, an issue can be capable of repetition under our mootness doctrine even though the parties are unlikely to litigate the same issue again. It is sufficient that the issue be capable of repetition in some future lawsuit; the identity of the parties is irrelevant. Although Contestants and Contestees are unlikely to ever litigate these issues again, the issues are still capable of repetition in future election contests.

## III. STATUTORY BACKGROUND

{12} The thrust of the contest and this appeal is that when eligible voters are provided invalid ballots omitting candidates required to be on the ballot and the number of votes is sufficient to effect the outcome of the election, a new election must be held to comply with article II, § 8 which provides, "All elections shall be free and open, and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage." Also central to this case is NMSA 1978, § 1–14–13 (1969), which provides:

A. In any election contest a prima facie showing that the precinct board of any precinct has failed to substantially comply with the provisions of the Election Code ... that protect the secrecy and sanctity of the ballot and prescribe duties of the precinct board during the conduct of election, shall cast upon the candidates of the political party having majority representation on the precinct board the burden of proving that no fraud, intimidation, coercion or undue influence was exerted by such members of the precinct board, and that the secrecy and purity of the ballot was safeguarded and no intentional evasion of the substantial requirements of the law was made.

B. Upon failure to make such a showing upon which the court shall so find, the votes of that entire precinct shall be rejected; provided, that no such rejection shall be made where it appears to the court that the members of the precinct board ignored the requirements of the Election Code with the probable interest of procuring the rejection of the entire vote in the precinct.

{13} The trial court found that the precinct board had failed to comply with the Election Code, that there was no fraud involved in the matter, and that there was no feasible way in which to determine for whom the sixty-six voters had voted. *See Darr v. Village of Tularosa*, 1998–NMCA–104, ¶ 8, 125 N.M. 394, 962 P.2d 640 (interpreting analogous Municipal Election Code, and holding that all the votes in a precinct should be rejected only if the contestant can show that violation of the statute renders it impossible to determine which candidate received the plurality of lawful votes). The court concluded, "The best that [Contestants] can hope to accomplish is to show that [mistakes] were made by election officials which cast in doubt the results in Precinct 31; upon that showing, the only authority in this Court would be to discard the entirety of Precinct 31, which does not change the result of the election for either Contestant." The trial court thus in effect rejected the votes.

{14} Contestants argue that Section 1–14–13 does not apply because it only governs the mistakes of the precinct board, the County Clerk was responsible for the incorrect ballot face in this case, and the County Clerk is not a member of the precinct board. We find this argument persuasive. For the purposes of the Election Code, precinct board means "the appointed election officials serving a single precinct or a consolidated precinct," NMSA 1978, § 1–1–13 (1969), and does not include the County Clerk, *see* NMSA 1978, § 1–2–12 (1995) (describing composition of precinct board).

{15} The next question is whether the precinct board is responsible for having an incorrect ballot face placed in machine 4719 or for commingling the votes after the incorrect ballot face was discovered. It is the County Clerk's duty to prepare the ballot, *see* NMSA 1978, § 1–10–4 (1985), and the term "ballot" includes the ballot face, *see* NMSA 1978, § 1–10–1 (1985). After reviewing the Election Code, we do not believe that the precinct board has any duty with respect to the accuracy of the names on the ballot or what to do when an inaccurate ballot is discovered. Section 1–14–13 appears inapplicable where, as here, the only statutory duty that may have been breached belonged to the County Clerk, not the precinct board. We note that there is a gap in the statutory scheme to which the legislature may deem it appropriate to direct its attention.

## IV. THRESHOLD CONSTITUTIONAL ISSUES

{16} In fact, however, the problem survives whoever is responsible for it. Discarding the votes in Precinct 31 has no effect on the election only if it is assumed that the sixty-six commingled votes were cast as they would have been cast had the correct ballot

face been available to those voters. Sixty-six votes must be subtracted from the winner's total and added to the loser's, and the winner's total must still be greater, before it is known what the effect of the voting irregularity was on the election. The common law rule to be applied in such cases was stated in *Creamer v. City of Anderson*, 240 S.C. 118, 124 S.E.2d 788, 791 (1962):

> But it seems to us, apart from the matter of precedent, that the rule that has been followed by this court for more than a century and a half in cases involving election to public office ... is better calculated to safeguard the purity of elections by sending the matter back to the people whenever so many illegal votes have been cast that their deduction from the winning side would affect the result, so that upon a new election it may be determined with certainty which candidate ... has received the greatest number of unquestionable votes.

*See also Forbes v. Bell*, 816 S.W.2d 716, 720 (Tenn.1991) (internal quotation marks omitted); *McCavitt v. Registrars of Voters*, 385 Mass. 833, 434 N.E.2d 620, 631 (1982); *Akizaki v. Fong*, 51 Haw. 354, 461 P.2d 221, 222 (1969); *Santucci v. Power*, 33 A.D.2d 517, 304 N.Y.S.2d 926, 927 (1969). Contestants claim, essentially, that this rule has been strictly carried over by article II, § 8, and that it provides a remedy.

{17} Contestees agree that the propulsive force of contestants' argument is that the Constitution requires a new election when the number of miscast votes is greater than the initial margin of victory. This being so, it must be asked at the outset whether contestants have standing to assert the rights of third party voters.

{18} Contestants claim the direct benefit of art. II, § 8, asserting in their complaints that "voters were denied their basic and fundamental rights ... to vote" and that "the right of qualified candidates to have all qualified citizens desiring to vote be allowed to vote is constitutionally protected." But it is not clear that that section was intended for the benefit of political candidates, rather than to preserve to the elector the right to vote. It was said in *Valdez v. Herrera*, 48 N.M. 45, 47, 145 P.2d 864, 870 (1944), which was an election contest:

> It is a rule well grounded in justice and reason, and well established by authority and precedent, that the voter shall not be deprived of his rights as an elector either by fraud or the mistake of the election officers if it is possible to prevent it ... We said in *State ex rel. Read v. Crist [Christ]*, 25 N.M. 175, [199,] 179 P. 629, 637 [1919], "the voter should not lightly be deprived of his right, nor should the successful candidate suffer, if by any reasonable interpretation of the laws governing elections it can be prevented."

*Valdez* did not deal with art. II, § 8. Contestants do cite a case where the constitutional right to vote has been used by politicians who had been denied access to the ballot, *McCarthy v. Slater*, 553 P.2d 489, 490–91 (Okla.1976) (allowing non-partisan electors in presidential election on ballot).

{19} The cases which have similar constitutional provisions to the one here are divided on this issue. The Missouri Supreme Court has taken a liberal view and extended the coverage of the constitutional protection to candidates for office. *See Kasten v. Guth*, 375 S.W.2d 110, 114 (Mo.1964) (holding provision protects the right of write-in candidates to be on the ballot); *Preisler v. City of St. Louis*, 322 S.W.2d 748, 753 (Mo.1959) (holding provision gives every eligible person the right to become a candidate for office). The Utah court has held that this provision does not work to the benefit of candidates. *See Anderson v. Cook*, 102 Utah 265, 130 P.2d 278, 285 (1942) ("While this provision guarantees the qualified elector the free exercise of his right of suffrage, it does not guarantee any person the unqualified right to appear as a candidate upon the ticket of any political party.") We agree that art. II, § 8 protects the right of qualified electors to vote but that it does not by itself allow the present contestants to proceed "in the name of the right to vote." As mere politicians or candidates for office, they have no constitutional right to be voted *for*.

{20} It is inevitable, therefore, that we confront the problem of standing, the lack of which is a potential jurisdictional defect, *Town of Mesilla v. City of Las Cruces*, 120 N.M. 69, 70, 898 P.2d 121, 122

(Ct.App.1995), which "may not be waived and may be raised at any stage of the proceedings, even sua sponte by the appellate court." *Alvarez v. State Taxation and Revenue Dep't*, 1999–NMCA–006, ¶ 6, 126 N.M. 490, 971 P.2d 1280 (internal citations omitted). *See also Wilson v. Denver*, 1998–NMSC–016, ¶ 8, 125 N.M. 308, 961 P.2d 153. Generally, one may not assert the constitutional rights of another. *See, e.g., Bell v. Planning and Zoning Comm'n*, 174 Conn. 493, 391 A.2d 154, 157 (1978); *In re Quinlan*, 70 N.J. 10, 355 A.2d 647, 660 (1976). It has been explained by the Supreme Court that this rule is not constitutionally required but is only a "rule of practice," however weighty, *United States v. Raines*, 362 U.S. 17, 22, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960), which is subject to countervailing policies. "For example, where, as a result of the very litigation in question, the constitutional rights of one not a party would be impaired, and where he has no effective way to preserve them himself, the Court may consider those rights as before it." *Id.* (citing *NAACP v. Alabama*, 357 U.S. 449, 459–60, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958)).

> When a person or entity seeks standing to advance the constitutional rights of others, we ask two questions: first, has the litigant suffered some injury-in-fact, adequate to satisfy Article III's case-or-controversy requirement; and second, do prudential considerations ... point to permitting the litigant to advance the claim?

*Caplin and Drysdale, Chartered v. United States*, 491 U.S. 617, 624, 109 S.Ct. 2646, 105 L.Ed.2d 528 (1989). Two particular prudential concerns have been recognized: "first that constitutional rights should not be litigated unnecessarily, and second, that the third party may not be able to advocate the right as effectively as its actual holder." *Lewis v. Iowa Dist. Court*, 555 N.W.2d 216, 219 (Iowa 1996). We think in an election contest such as this one that the requirements for asserting the standing of a third party are met. Contestants are after all working against the impairment of the rights of voters, whose organization into a body of plaintiffs would not be as feasible or effective as allowing their interests, or possible interests at least, to be represented by contestants. There is no doubt that contestants have suffered an injury in fact—the emoluments of office—and similarly, constitutional rights are not being litigated unnecessarily. We therefore conclude that while contestants do not enjoy directly as political candidates the protection of art. II, § 8, they have standing to assert the rights of those voters whose votes were incorrectly tabulated.

## V. POWER TO FASHION A REMEDY

{21} Assuming the Election Code does not provide a remedy when candidates' names are omitted from the ballot, may courts grant remedies not found in the Code? Separation of powers principles might support the argument that a court may not do so; it might not be appropriate for a court to apply its remedy to a disrupted election without express statutory authority. *See Cure v. Bd. Of County Comm'rs of Hodgeman County, Kansas*, 263 Kan. 779, 952 P.2d 920 (1998) (rejecting an election contestant's argument that the election should be invalidated because lacking constitutional or statutory authority the court would not invalidate an election). However, separation of powers is not absolute and would therefore not necessarily prevent a court from fashioning appropriate relief if the Code fails to provide for it. Courts must often fill in gaps in statutory schemes in order to achieve just results. The Supreme Court of North Dakota, justifying its conclusion that a new election was required absent statutory authority, reasoned that:

> [E]xperience tells us that neither a statute, rule, nor regulation can pragmatically cover every situation that may arise, and as a result the official body required to act or make a decision or fashion a remedy must fill the interstices in accordance with those legal concepts, principles, or objectives which may apply to the situation and that are in harmony and legally compatible with the rule, regulation, or statute.

*State ex rel. Olson v. Bakken*, 329 N.W.2d 575, 580 (N.D.1983). Appellate courts in other jurisdictions have held that a new election is an appropriate remedy under some circumstances even though the election code does not provide for that remedy. *See, e.g., Ferguson v. Rohde*, 449 S.W.2d 758, 761 (Ky. App.Ct.1970) (holding that the number of

voters prevented from voting due to candidate's name being left off ballot could have changed the result; new election ordered); *McCavitt*, supra; *Morrison v. Crews*, 192 Tenn. 20, 237 S.W.2d 1 (1951).

{22} Contestees cite a number of cases for the proposition that the Election Code provides the exclusive remedies for election contests in New Mexico. *See Eturriaga v. Valdez*, 109 N.M. 205, 210, 784 P.2d 24, 29 (1989) ("[T]he Election Code has no remedy in a situation such as this, where a primary election contest has not been resolved before the voting in the general election."); *Dinwiddie v. Bd. Of County Comm'rs*, 103 N.M. 442, 445, 708 P.2d 1043, 1046 (1985) ("The right to contest an election is entirely statutory; such a proceeding was unknown at common law."); *Montoya v. McManus*, 68 N.M. 381, 384, 362 P.2d 771, 773 (1961) (holding, under an earlier version of the Election Code, "an election contest is a special proceeding unknown to the common law."). The question is whether our cases support this or a slightly different proposition.

{23} For example, in *Eturriaga*, 109 N.M. at 209–10, 784 P.2d at 28–29, the primary issue was *not* which remedies the court had the power to grant, but what procedure a contestant must follow. The issue in that case involved the time for filing a primary election contest, and the Court held that the Election Code governed and that a court could not override the statutory limitation. *See id.* at 210, 784 P.2d at 29.

{24} Contestees quote *Dinwiddie*, 103 N.M. at 445, 708 P.2d at 1046, for the following proposition: "One has the right to contest an election only in the manner and to the extent prescribed by statute." That proposition can be traced back to *State ex rel. Denton v. Vinyard*, 55 N.M. 205, 230 P.2d 238 (1951). The issue in *Vinyard* was whether the trial court properly dismissed the case for lack of jurisdiction. *See id.* at 207, 230 P.2d at 239. Reasoning that there was no procedure for contesting elections at common law and that the Election Code did not apply to the local option election at issue, the Court concluded that the district court lacked jurisdiction over the election. *See id.* at 209–10, 230 P.2d at 240–41.

{25} Contestees also cite *Montoya*, but the issue in *Montoya* was whether a statute deal-

ing with costs of civil litigation applied in an election contest. The Court concluded that special statutory proceedings such as election contests are not governed by the rules of civil procedure if those rules are inconsistent with the procedural rules for special statutory proceedings. *See Montoya*, 68 N.M. at 386, 362 P.2d at 774. Nowhere in *Montoya* did the Court discuss its power to provide remedies not specified in the Election Code.

{26} Our cases indicate that it is the procedure in an election contest which is exclusive, not the grounds and the remedy. This accords with the need for speedy resolution of election contests; contestants are not permitted to proceed under the rules of civil procedure because the procedure set forth in those rules takes too much time. Common sense suggests that the grounds for an election challenge need not be found in the Code, such as the protection of the basic right to vote for the candidate of one's choice. This case is an example. The omission of a candidate's name from the ballot has deprived some voters of that choice, thereby, strictly speaking, compromising the validity of the election. *See State ex rel. Rice v. Dillon*, 197 Miss. 504, 19 So.2d 918, 920 (1944) ("The freedom of the voters to choose between qualified candidates is the very foundation of a valid election.") We conclude there is no barrier to our fashioning a remedy outside the Code.

## VI. VIOLATION OF ARTICLE II, SECTION 8

{27} Article II, section 8 provides: "All elections shall be free and open, and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage." Assuming courts have the power to fashion remedies not included in the Election Code, the issue is whether the omission of the candidates' names from the ballot violated article II, section 8. Our appellate courts have never published an opinion interpreting this section. Although four states (Colorado, Missouri, Montana, and South Carolina) have "free and open" clauses in their state constitutions, we have been unable to find any useful interpretations, bearing on this issue, of those clauses in their case law.

Thirteen states require that elections be "free and equal," language that is similar enough, in that it connotes all eligible voters should have the chance to vote, so that their interpretations might inform our interpretation of our own provision.

{28} Section 6 of the Kentucky Constitution requires that all elections be "free and equal," and Kentucky has the most developed jurisprudence of any state on what that clause means in relation to ballot problems. In an early case, the Kentucky Court of Appeals announced that "no election can be free and equal ... if any substantial number of persons entitled to vote are denied the right to do so." *Wallbrecht v. Ingram*, 164 Ky. 463, 175 S.W. 1022, 1026–27 (1915). It also held that a party seeking to prove that an election was not free and equal did not have to prove that fraud or other wrongdoing occurred; negligence is sufficient. *See id.* at 1027. The Kentucky Supreme Court has invalidated election results three times due to violations of section 6. In *Lakes v. Estridge*, 294 Ky. 655, 172 S.W.2d 454, 454 (1943), the ballot was printed incorrectly in three of the five precincts; the proper candidates were not listed. The Court concluded that the election was not free and equal. *See id.* at 456. In *Hillard v. Lakes*, 294 Ky. 659, 172 S.W.2d 456, 456 (1943), the ballot listed the wrong candidates in one of three precincts, and the Court concluded that the election was not free and equal and that the office must be considered vacant. In *Ferguson*, 449 S.W.2d at 760, the county clerk omitted the name of one qualified candidate from the ballot, and the Court concluded that the election was not free and equal.

■ {29} We believe these cases rest on a fundamental principle that an election is only "free and equal" if the ballot allows the voter to choose between the lawful candidates for that office and that the same principle should guide our interpretation of the "free and open" clause in article II, section 8. We therefore conclude that a constitutional violation occurred here.

## VII. REMEDY

■ {30} Contestants argue that the election results at issue are void because the election was not "free and open" as required by article II, § 8 and because it is impossible to determine which candidate received the most votes due to the errors that rendered the election unconstitutional. We have seen that the traditional remedy, where there has been no statute available to apply to the case, has been to order a new election. *Creamer, supra.*

{31} Recognizing that the call for a new election does have some appeal, we instead adopt a more realistic and pragmatic approach, in that holding a new election takes time and is cumbersome. We are drawn to the case of *Huggins v. Super. Ct.*, 163 Ariz. 348, 788 P.2d 81, 84 (1990), where the contestant in an election contest demanded the election be nullified and a new election held because the margin of victory was exceeded by the number of invalid votes. The court said

> A second election, however, is not immune from illegal ballots and may prove no better than the first. Moreover, a second election is costly, and the costs are not limited to the heavy fiscal expense of running an election another time. Some votes will be lost in a second election that were properly recorded in the first; these include voters who have died, voters who have moved, and voters whose interest in the office or electoral issue is too attenuated to pull them to the polls a second time.

The *Huggins* court went on to quote from Note, *Developments in the Law: Elections,* 88 Harvard L.Rev. 1111, 1315 (1975):

> [T]here may ... be identifiable biases in second elections. Candidates with ready access to financing and with strong and continuing party organizations will be able to mobilize a second campaign in the short time available much more effectively than opponents who lack such advantages. Candidates with support concentrated among less active voters may be disadvantaged in a second election if such supporters do not turn out to cast ballots when only one office is at stake.

{32} We find that these last factors of election economy, relative certitude of result, and fairness to the candidates to be compelling. To hold a new election would not be to capture the will of the electorate as it existed at the time of the contested election, but

would rather reflect an entirely different set of circumstances in terms of the composition of the electorate and the attractiveness of the candidates, making it an exercise in futility to try to replicate the election.

{33} The question, therefore, is what relief is available? It is striking that the legislature put in place a mechanism whereby, in the absence of fraud, when a noncompliance with the Election Code is committed by the *precinct board,* "the votes of [the] entire precinct shall be rejected." Section 1–14–13(B). This shows that the legislature believed rejection was the proper way of handling a situation where the votes in a precinct are tainted and the "sanctity of the ballot" is threatened. The same maladjustment in the system has occurred in the case of an error by the county clerk as would occur in the case of an error by the precinct board. Intuitively, then, it appears the statute may have some relevance to the precise case at hand. "Since time immemorial, in the absence of a statute specifically governing a given issue, common law courts have structured rules to resolve the specific issue before them by analogizing to statutes covering the same general subject matter." *Kampsen v. County of Kandiyohi,* 441 N.W.2d 103, 106 (Minn.1989). "A statute that does not by its terms govern the case before a court may contain indicators of the legislature's judgment on relevant issues of policy or provide an appropriate principle for decision of the case." *Illinois v. Milwaukee,* 599 F.2d 151, 164 (7th Cir.1979) (footnote omitted), *reversed on other grounds, City of Milwaukee v. Illinois,* 451 U.S. 304, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981). There should be no question that a statute may provide the basis upon which to solve a related legal issue by analogy. *See* Roscoe Pound, *Common Law and Legislation,* 21 Harvard L.Rev. 383, 385–86 (1908); Harlan F. Stone, *The Common Law in the United States,* 50 Harvard L.Rev. 4, 11–14 (1937) ("[I] can find in the history and principles of the common law no adequate reason for our failure to treat a statute much more as we treat a judicial precedent, as both a declaration and a source of law, and as a premise for

legal reasoning."); *Van Beeck v. Sabine Towing Co.,* 300 U.S. 342, 351, 57 S.Ct. 452, 81 L.Ed. 685 (1937) (Cardozo, J.) ("[A] legislative policy ... is itself a source of law, a new generative impulse transmitted to the legal system."); Roger J. Traynor, *Statutes Revolving in Common Law Orbits,* 17 Catholic U.L.Rev. 401, 425 (1968) ("[J]udicial rules *analogized* from statutes are at one with other judicial lawmaking."). *See also* Robert F. Williams, *Statutes as Sources of Law Beyond Their Terms in Common Law Cases,* 50 Geo. Wash. L.Rev. 554 (1982).[1] The success of the method of "cautious extension of statutory rules into areas of common law" "depends on a unified, coherent expression of legislative policy embodied in a statute or statutes from which a common law rule can be derived." *Lane v. Hughes Aircraft Co.,* 22 Cal.4th 405, 93 Cal.Rptr.2d 60, 70–71, 993 P.2d 388 (2000).

{34} The New Mexico Court of Appeals has recognized the value of looking to statutes as a source of law.

> Common law precedent is not, however, the only source of policy to guide the courts. Statutes, enacted by persons elected to represent the public will, may be a more reliable source of information concerning community norms and policy. Virtually from its inception, the common law has progressed by incorporating legislative enactments into its fabric.

*Sanchez v. San Juan Concrete Co.,* 1997–NMCA–068, ¶ 15, 123 N.M. 537, 943 P.2d 571. *See also National Trust v. City of Albuquerque,* 117 N.M. 590, 593, 874 P.2d 798, 801 (Ct.App.1994).

{35} In the present case, as noted, the effect of the underlying action contemplated by the statute is the same as that which has happened, the difference being that the underlying action was taken by the County Clerk and not the precinct board. It is therefore sound reasoning, where there has been no fraud, to exact a form of relief from the statute. This means the entire vote of precinct 31 is to be rejected. The result of the election remains unchanged.

---

1. *See also Pope v. Atlantic Coast Line R.R.,* 345 U.S. 379, 390, 73 S.Ct. 749, 97 L.Ed. 1094 (1953) (Frankfurter, J., dissenting) ("Statutes, even as decisions, are not to be deemed self-enclosed instances; they are to be regarded as starting points of reasoning....")

**744**

*VIII. CONCLUSION*

{36} We have held that although this case is moot, the argument of Contestants that the election was not "free and open," involving a state constitutional issue and arguably requiring a new election, raised issues capable of repetition. We have determined that Contestants have standing to assert the rights of third party voters. While the Election Code sets out the exclusive procedure for contesting the results of an election, the grounds for such challenge and the remedies available may be found outside the Code. We conclude that a constitutional violation occurred, but that holding a new election was an unsatisfactory remedy. The remedy indicated by the facts of the case, the statutory scheme, and the authorities is to draw an analogy to section 1–14–13 and reject the votes in precinct 31.

{37} **IT IS SO ORDERED.**

WE CONCUR: PATRICIO M. SERNA, Chief Justice, GENE E. FRANCHINI, Justice, PAMELA B. MINZNER, Justice, and JOSEPH F. BACA, Justice (recused).