2003-NMCA-011

61 P.3d 877

Luis B. JUAREZ, as Personal Representative under the Wrongful Death Act of Rodolfo Ledezma, Dolores G. Ledezma, surviving widow, Individually, Luis B. Juarez, as next friend for Rudy Ledezma, II, a minor child, Plaintiffs–Appellants,

v.

Kirk L. NELSON, D.O., and Presbyterian Healthcare Services, a Corporation, Defendants–Appellees.

No. 21,618.

Court of Appeals of New Mexico.

Dec. 3, 2002.

Kevin J. Hanratty, Hanratty Law Firm, Artesia, NM, for Appellants.

Remo E. Gay, Butkus, Gay & Jahner, P.C., Albuquerque, NM, for Appellee, Kirk L. Nelson, D.O.

W. Mark Mowery, Edward Ricco, Rodey, Dickason, Sloan, Akin & Robb, P.A., Albuquerque, NM, for Appellee, Presbyterian Healthcare Services.

## OPINION

ALARID, Judge.

{1} This matter comes before the Court upon the unopposed motion for rehearing of Appellee Presbyterian Health Services. We grant the motion for rehearing and substitute the following opinion in place of our opinion filed 10–21–02.

{2} In this appeal we address the issue of whether the "continuous treatment doctrine" is compatible with the statute of repose of the Medical Malpractice Act. We hold that it is not. We also address the issue of whether the running of the statute of repose was tolled by fraudulent concealment. We conclude that the district court properly granted summary judgment against Plaintiffs on the issue of fraudulent concealment. Lastly, we address the question of whether a vicarious liability malpractice claim against an employer that is not a qualified health care provider must be dismissed when the claim against the employee is barred by the statute of repose of the Medical Malpractice Act. We hold that the statute of repose of the Medical Malpractice Act, as a benefit of the act, is not available to an employer that is not itself a qualified health care provider.

## BACKGROUND

{3} Rodolfo Ledezma died on May 28, 1995. At the time of his death, Mr. Ledezma was a patient of Defendant, Kirk L. Nelson, D.O., who started treating Mr. Ledezma for a heart condition in January 1995. Mr. Ledezma's last office visit with Dr. Nelson occurred on February 28, 1995. Mr. Ledezma was to have seen Dr. Nelson on June 1, 1995, for a scheduled ninety-day review. However, on May 28, 1995, Dr. Nelson was called to the emergency room of Plains Regional Medical Center after Mr. Ledezma had been brought in suffering from an apparent heart attack. Dr. Nelson and emergency room personnel were unable to resuscitate Mr. Ledezma, and Mr. Ledezma was pronounced dead. In a "Death Summary" dictated by Dr. Nelson on May 28, 1995, Dr. Nelson stated the cause of death as "[c]ardiovascular collapse, most likely secondary to a massive pulmonary embolus" and "[h]istory of hypertension." An autopsy performed by the medical examiner confirmed that Mr. Ledezma died from a heart attack.

{4} On May 27, 1998, Luis B. Juarez, as next friend of Mr. Ledezma's minor son, Rudy Ledezma II, and as personal representative under the wrongful death act; Dolores G. Ledezma, as surviving spouse; Melissa Lynn Ledezma–Crowe, Teresa Ann Ledezma, and Rebecca L. Ledezma, as surviving children (Plaintiffs), filed a "Complaint to Recover Wrongful Death Damages Due to Medical Negligence" naming as Defendants Dr. Nelson and Dr. Nelson's employer, Presbyterian Healthcare Services (PHS). Plaintiffs alleged that Dr. Nelson and PHS were negligent in diagnosing and treating Mr. Ledezma's heart condition. Plaintiffs did not allege that Dr. Nelson or PHS provided Mr.

Ledezma with substandard care in the emergency room on May 28, 1995.

{5} In December 1999 Dr. Nelson filed a motion for summary judgment asserting that the complaint had not been filed within the time allowed by NMSA 1978, § 41–5–13 (1976). Dr. Nelson relied on his status as a qualified heath care provider and upon the undisputed fact that he had not seen Mr. Ledezma between February 28, 1995, the date of the last office visit, and May 28, 1995, the date Mr. Ledezma arrived in the emergency room suffering from a heart attack. In response to Dr. Nelson's motion, Plaintiffs argued that undisputed evidence that Dr. Nelson had scheduled a June 1, 1995, return visit supported tolling of the limitations period under "continuing treatment" and "continuing tort" theories. Plaintiffs also argued that the limitations period should be tolled by Dr. Nelson's allegedly fraudulent concealment of certain medical records of Mr. Ledezma's that were not produced until discovery in the present case, and by Dr. Nelson's failure to inform the Ledezmas that he had been in private practice for only six months, and that he had failed the board examination in internal medicine. PHS filed a motion for summary judgment in which it argued that to the extent Plaintiffs' claims against PHS were based on PHS's vicarious liability for Dr. Nelson's malpractice, PHS was entitled to assert the limitations defense available to its employee, Dr. Nelson. The district court ruled that Plaintiffs had failed to demonstrate a genuine issue of material fact as to circumstances that would avoid application of Section 41–5–13 to their claims. The district court entered summary judgment in favor of Dr. Nelson as to "all matters in dispute" between Plaintiffs and Dr. Nelson. The district court granted partial summary judgment in favor of PHS, ruling that any claims against PHS based on the actions of Dr. Nelson were barred by Section 41–5–13. The district court certified the order granting partial summary judgment to PHS as final pursuant to Rule 1–054(B)(1).

## DISCUSSION

### 1. Dr. Nelson

#### a. Continuous Treatment Doctrine

{6} Plaintiffs argue that the running of the three-year period of Section 41–5–13 was tolled by the "continuous treatment doctrine." The question of whether the continuous treatment doctrine is compatible with Section 41–5–13 presents a question of statutory interpretation, which we review de novo: "[w]hen summary judgment depends entirely on the interpretation of a statute, . . . we will review the trial court's construction of the statute de novo." *Wilson v. Denver*, 1998–NMSC–016, ¶ 13, 125 N.M. 308, 961 P.2d 153 (citations omitted).

{7} In *Ealy v. Sheppeck*, 100 N.M. 250, 669 P.2d 259 (Ct.App.1983), we considered the continuous treatment doctrine as a matter of first impression in New Mexico. Examining cases from other jurisdictions, we found dispositive the requirement that for the continuous treatment doctrine to apply the defendant physician must have provided "continuous medical service." *Id.* at 251, 669 P.2d at 260 (citing with approval *Davis v. City of New York*, 38 N.Y.2d 257, 379 N.Y.S.2d 721, 342 N.E.2d 516 (1975)). We held on the particular facts of Ealy that the plaintiff had not made out a case that the defendant, a radiologist consulted by the patient's treating physician, had provided continuous treatment to the patient. *Id.* Our research indicates that Ealy is something of a dead end: we could find no later cases relying on Ealy as authority for the proposition that New Mexico recognizes the applicability of the continuous treatment doctrine to qualified health care providers.

{8} In Ealy, we applied the continuous treatment doctrine without addressing the logically antecedent question of whether the continuous treatment doctrine is compatible with Section 41–5–13. Here, in contrast to Ealy, Plaintiffs came forward with evidence that Dr. Nelson examined Mr. Ledezma in January and February 1995, adopted a treatment plan, prescribed medicine pursuant to that plan and scheduled a ninety-day periodic review for June 1, 1995. This evidence was sufficient to demonstrate a genuine issue of fact as to Dr. Nelson's provision of "continuous medical services" to the date of Mr. Ledezma's death and to materially distinguish the present case from Ealy. We therefore take the present opportunity to address

the relationship of the continuous treatment doctrine to Section 41–5–13.

■ {9} Section 41–5–13 provides as follows:

No claim for malpractice arising out of an act of malpractice which occurred subsequent to the effective date of the Medical Malpractice Act ... may be brought against a health care provider unless filed within three years after the date that the act of malpractice occurred....

Section 41–5–13 applies to wrongful death actions predicated on medical malpractice. *Armijo v. Tandysh,* 98 N.M. 181, 183, 646 P.2d 1245, 1247 (Ct.App.1981), overruled on other grounds by *Roberts v. Southwest Cmty. Health Servs.,* 114 N.M. 248, 254, 837 P.2d 442, 448 (1992).

■ {10} Section 41–5–13 was enacted "in response to a perceived medical malpractice insurance crisis in New Mexico." *Roberts,* 114 N.M. at 251, 837 P.2d at 445. In enacting Section 41–5–13, the Legislature rejected a discovery-based approach to accrual; and instead, by codifying a date-of-the-negligent-act rule, "specifically chose to insulate qualified health care providers from the much greater liability exposure that would flow from a discovery-based accrual date." *Id.* at 252, 837 P.2d at 446.

The New Mexico legislature apparently concluded that the potential for a malpractice suit being filed long after the act of malpractice was one of the reasons that insurance carriers were withdrawing from medical malpractice liability coverage. The legislature's solution ... was to preclude almost all malpractice claims from being brought more than three years after the act of malpractice.

*Cummings v. X–Ray Assocs. of N.M.,* 1996–NMSC–035, ¶ 40, 121 N.M. 821, 918 P.2d 1321 (1996). Under Section 41–5–13, the three-year period within which a malpractice action must be brought begins "to run from the time of the occurrence of the act giving rise to the cause of action." *Kern v. St. Joseph's Hosp., Inc.,* 102 N.M. 452, 455, 697 P.2d 135, 138 (1985).

{11} The continuous treatment doctrine operates in the following manner:

[I]f the treatment by the doctor is a continuing course and the patient's illness, injury or condition is of such a nature as to impose on the doctor a duty of continuing treatment and care, the statute does not commence running until treatment by the doctor for the particular disease or condition involved has terminated.

1 Davis W. Louisell & Harold Williams Wachsman, Medical Malpractice § 13.03 at 13–36 (1982) (quoted in *Lane v. Lane,* 295 Ark. 671, 752 S.W.2d 25, 26–27 (1988)). Proponents of the continuous treatment doctrine justify it on the following grounds:

Two rationales support the continuous treatment doctrine. Under the first rationale, it is not reasonable to expect a patient under continuing care of a doctor to discover that the doctor's acts may be the cause of the injury.

Four interrelated concerns underlie this rationale. First, a negligent doctor may conceal important information from a patient during treatment. Second, a confidential relationship between doctor and patient might inhibit the patient from questioning the care given during the existence of the relationship. Third, the chance that investigating the cause of an injury will interrupt care weighs against requiring a patient to discover an injury during the course of continuous treatment. Last, the need for flexibility in determining the cause of a latent injury supports the rationale.

The second rationale holds that it is absurd to expect a patient who is being treated by a doctor or hospital to interrupt corrective treatment by instituting suit against either while under their continuing care. This rationale recognizes that a patient's relationship with those caring for the patient is based upon trust in their medical skills. So if corrective treatment is necessary, it would be contrary to the patient's own interest in the patient's cure and recovery to disrupt the relationship by suing those caring for the patient. In these circumstances, it would make no sense to require the patient to sue.

*Langner v. Simpson,* 533 N.W.2d 511, 519–20 (Iowa 1995) (citations omitted).

{12} In construing Section 41–5–13, "our primary focus is to ascertain and give effect to the intent of the legislature." *Roberts,* 114 N.M. at 251, 837 P.2d at 445. We presume that the Legislature, in enacting the Medical Malpractice Act, "canvassed the current trends in malpractice law," *id.* at 252, 837 P.2d at 446, including the continuous treatment doctrine, *Cunningham v. Huffman,* 154 Ill.2d 398, 182 Ill.Dec. 18, 609 N.E.2d 321, 324 (1993) (concluding that Illinois General Assembly was aware of continuous treatment doctrine and "purposefully declined to act" when it enacted medical malpractice statute of repose without expressly providing for continuous treatment exception to four-year statute of repose).

■ {13} By deferring the point in time at which an instance of malpractice becomes time-barred, the continuous treatment doctrine would allow claims to be brought more than three years after the act of malpractice occurred. Superimposing the continuous treatment rule onto Section 41–5–13 would re-introduce the problem of "the potential for a malpractice suit being filed long after the act of malpractice." *Cummings,* 1996–NMSC 035, ¶ 40, 121 N.M. 821, 918 P.2d 1321. This is the very problem that the Legislature intended to eliminate when it enacted Section 41–5–13. We hold that the continuous treatment doctrine is incompatible with the public policy of New Mexico as expressed in Section 41–5–13. See *Young v. Williams,* 274 Ga. 845, 560 S.E.2d 690, 693 (2002) (rejecting continuous treatment doctrine; observing that medical malpractice statute of limitations does not provide for the commencement of the period of limitation upon the termination of the health-care provider's treatment of the patient, and the judicial branch is not empowered to "engraft" continuous treatment doctrine onto what the legislature has enacted). We hereby repudiate any statements in Ealy suggesting that

New Mexico applies the continuous treatment doctrine to toll Section 41–5–13.[1]

**b. Continuing Tort**

■ {14} Plaintiffs argue that we should treat "the singular act of failing to refer out up to and including the date of death" as "[t]he act of malpractice." Plaintiffs refer us to *Martinez–Sandoval v. Kirsch,* 118 N.M. 616, 623, 884 P.2d 507, 514 (Ct.App.1994), where we noted with apparent approval the rule that where a series of actions by a defendant results in one indivisible harm, the plaintiff has one indivisible cause of action. Our own research indicates that there is well-reasoned authority for the proposition that an act of malpractice can consist of a course of negligent conduct. See *Cunningham,* 182 Ill.Dec. 18, 609 N.E.2d at 325 (rejecting continuous treatment doctrine, but recognizing that "occurrence" for purposes of statute of repose may include a "continuing negligent course of treatment for a specific condition"). We ourselves appear to have assumed, without expressly addressing the issue, that an entire course of treatment may be aggregated for purposes of determining the date from which Section 41–5–13 begins to run. E.g., *Keithley v. St. Joseph's Hosp.,* 102 N.M. 565, 567, 698 P.2d 435, 437 (Ct.App. 1984) (assuming without explanation that in case alleging six-week course of negligence in calculating and delivering radiation therapy Section 41–5–13 runs from date of last radiation treatment).

{15} Even if we were to treat Dr. Nelson's alleged negligent failure to refer Mr. Ledezma to a specialist as a single, continuing act of malpractice, Plaintiffs' continuing tort theory is of no assistance unless Dr. Nelson's alleged failure to "refer out" continued up to and through at least May 27, 1995.[2] There is no dispute that Dr. Nelson did not examine Mr. Ledezma between February 28, 1995, when the last office visit occurred, and May

---

1. We express no opinion as to whether the continuous treatment doctrine may apply to toll the statute of limitations in actions against non-qualified health care providers.

2. Section 41–5–13 requires the claim to have been brought within three years after the date that the act of malpractice occurred. Rule 1–006(A) NMRA 2002 provides that "[i]n computing any period of time prescribed … by any applicable statute, the day of the act, event or default from which the designated period of time begins to run shall not be included." If Dr. Nelson's alleged failure to refer out continued through at least May 27, 1995, Plaintiffs' May 27, 1998, complaint was timely filed.

28, 1995, when Dr. Nelson was called to the emergency room. Plaintiffs have conceded that Dr. Nelson was not negligent in treating Mr. Ledezma on May 28, 1995, following his heart attack. Thus, Plaintiffs' continuing tort approach depends upon the existence of a continuing duty extending through at least May 27, 1995, that would have required Dr. Nelson to revisit the question of whether he was competent to treat Mr. Ledezma's heart condition. Plaintiffs did not come forward with any evidence establishing a genuine issue of material fact as to whether the applicable standard of care imposed on Dr. Nelson a duty to reconsider his decision to treat Mr. Ledezma himself or to rethink his diagnosis between February 28 and May 28, 1995. We hold that, on this record, any act of malpractice by Dr. Nelson occurred no later than February 28, 1995, the date of the last office visit. See *Cummings*, 1996–NMSC–035, ¶ 55, 121 N.M. 821, 918 P.2d 1321 (stating that in mis-diagnosis case date of occurrence is the date that patient was last examined by defendant); accord *Havens v. Ritchey*, 582 N.E.2d 792 (Ind.1991) (holding that when sole claim of medical malpractice is a failure to diagnose, "the omission cannot as a matter of law extend beyond the time the physician last rendered a diagnosis"). Accordingly, Plaintiffs' claims against Dr. Nelson, which were filed more than three years after February 28, 1995, were barred by Section 41–5–13.

### c. Fraudulent Concealment

{16} Dr. Nelson's burden, as the party moving for summary judgment, was to make out a prima facie case of entitlement to summary judgment. See *Blauwkamp v. Univ. of N.M. Hosp.*, 114 N.M. 228, 232, 836 P.2d 1249, 1253 (Ct.App.1992). Dr. Nelson supported his motion for summary judgment with undisputed evidence that he did not see Mr. Ledezma between February 28, 1995, the date of the last office visit, and May 28, 1995, the date of Mr. Ledezma's death. As previously noted, Plaintiffs do not claim that Mr. Ledezma received substandard care on May 28, 1995. Dr. Nelson's evidence was sufficient to make out a prima facie case that Plaintiffs' complaint, which was filed on May 27, 1998, was filed more than three years

after the latest date on which Dr. Nelson had the opportunity to commit an act of malpractice. See *Cummings*, 1996–NMSC–035, ¶ 55, 121 N.M. 821, 918 P.2d 1321 (stating that in mis-diagnosis case date of occurrence is the date that patient was last examined by defendant). In order to overcome Dr. Nelson's prima facie showing and to establish a prima facie case that Dr. Nelson should be estopped from asserting Section 41–5–13, Plaintiffs had the burden of showing genuine issues of fact as to their counter-affirmative defense of estoppel based upon Dr. Nelson's fraudulent concealment. See *Kern*, 102 N.M. at 455–56, 697 P.2d at 138–39; *Keithley*, 102 N.M. at 569, 698 P.2d at 439.

■ {17} Dr. Nelson, citing *Kern*, argues that Plaintiffs are precluded from asserting equitable estoppel based upon fraudulent concealment because they learned of Dr. Nelson's malpractice shortly after Mr. Ledezma's death. According to Dr. Nelson, *Kern* held that estoppel based upon fraudulent concealment does not apply to any plaintiff who learns of the defendant's malpractice "within the statutory period." *Kern*, 102 N.M. at 456, 697 P.2d at 139. As we explain below, the statements from *Kern* on which Dr. Nelson relies were non-binding dicta, which have been overtaken by the Supreme Court's more recent pronouncements in *Garcia v. LaFarge*, 119 N.M. 532, 893 P.2d 428 (1995).

{18} In *LaFarge*, the Supreme Court summarized the law governing fraudulent concealment as follows:

Under principles of equitable estoppel, this Court recognizes the doctrine of fraudulent concealment to toll a statute of limitations. *Kern*, 102 N.M. at 455–56, 697 P.2d at 138–39. To toll the statute applicable here, the plaintiff must establish that the physician knew of his or her alleged wrongful act and concealed that act from the patient, or that the physician had material information pertinent to the discovery of his or her wrongful act and failed, under a duty to do so, to disclose that information. Because equity tolls the statute, it does so only as long as the patient is

not guilty of failing to exercise ordinary diligence in pursuit of a cause of action. 119 N.M. at 536, 893 P.2d at 432. In a footnote, the Supreme Court addressed the diligence requirement:

> In *Kern,* the diligence requirement was stated to be "that the patient did not know, or could not have known through the exercise of reasonable diligence, of his cause of action within the statutory period." 102 N.M. at 456, 697 P.2d at 139 (emphasis added). *Kern* relied on *Garcia v. Presbyterian Hospital Center,* 92 N.M. 652, 593 P.2d 487 (Ct.App.1979), for the proposition that the statute of limitations is not tolled if the patient knew of the cause of action within the statutory period. 102 N.M. at 456, 697 P.2d at 139. In *Garcia,* however, the patient did learn of the nondisclosure within the statutory period and the court [of appeals] tolled the limitations period until that discovery and allowed the plaintiff three years from that time to file suit. In *Kern* the patient did not discover the concealment until after the statutory period had expired, and thus the phrase "within the statutory period" was not dispositive.

*LaFarge,* 119 N.M. at 536 n. 1, 893 P.2d at 432 n. 1. Thus, the Supreme Court recognized in *LaFarge* that dicta in *Kern* may have created confusion as to the consequence of the plaintiff's discovery of the defendant's fraud prior to the expiration of the entire three-year period of Section 41–5–13. However, because of its view that the issue had not been adequately briefed by the parties, the *LaFarge* court declined to reach the question of fraudulent concealment, and instead decided the case on constitutional grounds. We take the present opportunity to settle the issue of what consequence attaches to the plaintiff's discovery of his cause of action before the entire statutory period has expired.

{19} Our research indicates that no reported New Mexico appellate decision has been decided on the ground that a plaintiff who has been delayed in discovering his or her cause of action by fraudulent concealment is precluded from relying on equitable estoppel merely because the defendant was not successful in deceiving the plaintiff for the entire period of the applicable statute of limitations. In *Hardin v. Farris,* 87 N.M. 143, 530 P.2d 407 (Ct.App.1974) and *Garcia v. Presbyterian Hosp. Ctr.,* 92 N.M. 652, 593 P.2d 487 (Ct.App.1979) we reversed judgments in favor of defendant health care providers notwithstanding showings by the defendants in each case that the plaintiff was aware of the malpractice prior to the expiration of the statute of limitations.

{20} In *Hardin,* the act of malpractice (an incomplete tubal ligation) allegedly occurred on June 20, 1969; the plaintiff became pregnant and gave birth to a child on July 4, 1972; and the lawsuit was filed on May 16, 1973. It appears from these facts that the plaintiff learned that she was still capable of becoming pregnant within three years from June 20, 1969 [3]—i.e., "within the statutory period." Nevertheless, we held that the allegations of plaintiffs' complaint made out a case of fraudulent concealment. We reversed the district court's order granting the defendant judgment on the pleadings and directed the district court to reinstate plaintiffs' complaint.

{21} In *Garcia,* 92 N.M. at 652, 593 P.2d at 487, the undisputed facts established that the plaintiff had been provided with negligent treatment for prostatic cancer in July 1972, that plaintiffs' counsel learned in September 1974 that the plaintiff had been subjected to malpractice, and that the plaintiffs' complaint was filed on July 13, 1976. Notwithstanding the undisputed fact that the plaintiff, through counsel, was aware of the malpractice within three years of the act of malpractice, we once again held that the plaintiff had made out a prima facie case that the statute of limitations was tolled by the defendant's nondisclosure. *Id.* at 655, 593 P.2d at 487.

---

**3.** *Hardin* was decided under NMSA 1953, § 23–1–8 (1880, as amended through 1909), which provided a three-year statute of limitation for personal injuries. Thus, in the absence of tolling, plaintiffs' complaint would have been timely if filed on or by June 20, 1972. Assuming a typical gestation period, plaintiffs whose child was born on July 4, 1972, would certainly have been aware prior to June 20, 1972, that the tubal litigation had failed.

176

{22} We recognize that we may not "summarily" disregard dicta in a decision of the Supreme Court. *State v. Johnson,* 2001–NMSC–001, ¶ 16, 130 N.M. 6, 15 P.3d 1233. However, in the case of the *Kern* "within the statutory period" dicta, the Supreme Court itself has suggested there is a question as to whether *Kern* limits the doctrine of fraudulent concealment to cases in which the concealment is not discovered until the applicable limitations period has expired. *LaFarge,* 119 N.M. at 536 n. 1, 893 P.2d at 432 n. 1. We further note that in describing the doctrine of equitable estoppel based upon fraudulent concealment, the *LaFarge* opinion does not include as an element the requirement that the plaintiff has been unable to discover his or her cause of action "within the statutory period." Since we must choose between competing Supreme Court formulations of the doctrine of equitable estoppel, we choose to follow the more recent statement in *La-Farge* which we have quoted above. The *LaFarge* formulation seems to us to strike a more satisfying balance between the purpose of equitable estoppel, which is to insure that "no person may obtain advantage by his own wrong." *Hardin,* 87 N.M. at 145, 530 P.2d at 409, and the equitable principle that "equity aids those who have been vigilant, not those who sleep on their rights," 27 A Am.Jur.2d Equity § 130 (1966). The *LaFarge* formulation restores to the defrauded plaintiff exactly the amount of time that was lost as the result of the fraudulent concealment regardless of whether the period of fraudulent concealment was a day, three months, or five years.[4]

{23} Applying *LaFarge,* we reach the following conclusions. First, Plaintiffs failed to establish a genuine issue of material fact that fraudulent concealment occurred before May 28, 1995, when the fact of Mr. Ledezma's fatal heart attack arguably could have alerted Dr. Nelson to the possibility that he had misdiagnosed Mr. Ledezma's heart condition. New Mexico has rejected a constructive fraud approach to fraudulent conceal-

ment "whereby if a physician has committed malpractice, then he 'should have known.' " *Kern,* 102 N.M. at 456, 697 P.2d at 139 (citation omitted). There is no direct or circumstantial evidence demonstrating a genuine issue of material fact that Dr. Nelson knew of any error in diagnosis or treatment prior to May 28, 1995. Thus, tolling by fraudulent concealment could not have begun any earlier than May 28, 1995.

{24} Second, the undisputed evidence establishes that within five days of Mr. Ledezma's death, Mrs. Ledezma was told by Dr. Nelson's nurse that "Dr. Nelson didn't do everything he could have done, and that I needed to get a lawyer." In addition, within a few days of Mr. Ledezma's death, Mrs. Ledezma was told by a family friend, who was a registered nurse and who had reviewed Mr. Ledezma's medical records, that Dr. Nelson had been negligent in not referring Mr. Ledezma to another doctor for "extra help." Applying the principle that equity tolls the statute "until the right of action is discovered, or, by the exercise of ordinary diligence, could have been discovered," *Hardin,* 87 N.M. at 146, 530 P.2d at 410, we conclude that Plaintiffs failed to demonstrate genuine issues of material fact as to circumstances that would have supported tolling beyond the first week after Mr. Ledezma's death. By the end of that week Plaintiffs, through Mrs. Ledezma, either discovered, or, by the exercise of ordinary diligence, could have discovered, their cause of action.

{25} Third, even if we assume that Dr. Nelson is equitably estopped from asserting the running of Section 41–5–13 during the five-day period from the date of Mr. Ledezma's death, May 28, 1995, until Mrs. Ledezma's discussions with Dr. Nelson's nurse and the family friend, Plaintiffs' complaint was still untimely. As we noted above in our discussion of Plaintiffs' continuing tort theory, Dr. Nelson did not see Mr. Ledezma between February 28, 1995, the date of the last office visit, and May 28, 1995, the date of

---

**4.** We recognize that our understanding of *La-Farge* and our approach to fraudulent concealment are in direct conflict with a recent decision of another panel of this Court. *Tomlinson v. George,* 133 N.M. 69, 61 P.3d 195 (2002) (holding fraudulent concealment inapplicable where plaintiff discovers cause of action prior to running of entire period prescribed by Section 41–5–13).

Mr. Ledezma's death. Dr. Nelson's evidence was sufficient to make out a prima facie case that Plaintiffs' complaint, which was filed on May 27, 1998, was filed more than three years after the latest date on which Dr. Nelson had the opportunity to commit an act of malpractice. See *Cummings*, 1996–NMSC–035, ¶ 55, 121 N.M. 821, 918 P.2d 1321 (stating that in mis-diagnosis case date of occurrence is the date that patient was last examined by defendant). Even if we were to toll Section 41–5–13 for the five days during which fraudulent concealment arguably may have occurred, Plaintiffs' complaint would still have had to have been filed no later than March 5, 1998, in order to have been timely.

## 2. PHS

{26} Plaintiffs appeal from the district court's judgment granting partial summary judgment in favor of PHS. The district court dismissed Plaintiffs' "claims set forth, or which could have been set forth, in Plaintiffs' Complaint against PHS for vicarious liability based upon alleged professional negligence on the part of Dr. Kirk L. Nelson."

{27} PHS does not claim that it was a qualified health care provider or that it can itself assert Section 41–5–13 as a defense. Instead, citing the rule that "exoneration of the servant operates in tort to exonerate the principal of vicarious liability," *Gallegos v. Citizens Ins. Agency*, 108 N.M. 722, 730, 779 P.2d 99, 107 (1989), PHS argues that the judgment dismissing Plaintiffs' claims against Dr. Nelson also bars any claim against PHS that is based upon vicarious liability for Dr. Nelson's alleged malpractice. Because the relevant facts are not in dispute, PHS's motion for summary judgment presents a question of law, which we review under a de novo standard. *Gunaji v. Macias*, 2001–NMSC–028, ¶ 8, 130 N.M. 734, 31 P.3d 1008.

{28} Defendant has not cited, and we are not aware of, any New Mexico case applying the principle that the "exoneration of the servant operates in tort to exonerate the principal of vicarious liability" where the employee has been "exonerated" by a statute of limitations. In *Gutierrez v. Albertsons, Inc.*, 113 N.M. 256, 264, 824 P.2d 1058, 1066 (Ct. App.1991), we expressly declined to address the issue of whether the running of the statute of limitations against an employee bars the vicarious liability of the employer. An examination of cases from other jurisdictions indicates that "exoneration of the servant" commonly is understood to mean acquittal of the employee or agent following a trial on the merits. E.g., *Lake Shore & Mich. S. Ry. Co.*, 2 Ill.App. 228 (Ill.App.Ct.1878).[5] As one court has explained:

The rule, we think, is one of logic rather than law. The rule underlying cases of this character is that the master is liable for the negligence of the servant on the ground that one who does a thing through another, his servant, does it himself and is responsible for the manner in which it is done. By using reason and common sense in applying this rule of law that, if the servant does the master's work in a negligent manner, the master is liable, we must also say that, if the servant did not do the work negligently, there is nothing for the master to be liable for. All that the master can do is to prove that the servant was not negligent, and, having proved that, as the jury finds, there is no negligence to be imputed to the master.

*Stith v. J.J. Newberry Co.*, 336 Mo. 467, 79 S.W.2d 447, 458 (1934). Cf. *Kinetics, Inc. v. El Paso Products Co.*, 99 N.M. 22, 653 P.2d 522 (Ct.App.1982) (holding that dismissal with prejudice of defendant partnership also exonerates defendant partner alleged to be vicariously liable for the partnership's wrongdoing), correctness questioned by *Gutierrez v. Albertsons, Inc.*, 113 N.M. 256, 264, 824 P.2d 1058, 1066 (Ct.App.1991). Further, the modern rule is that a judgment against a plaintiff and in favor of an employee-defendant does not preclude an action against the employee's principal where the judgment in

---

**5.** In addition, at common law, as a variant of the principle that a release of one joint tortfeasor is the release of all others jointly liable, a valid release of an employee also would result in the release of the employer. *Downer v. Southern*

*Union Gas. Co.*, 53 N.M. 354, 357, 208 P.2d 815, 816–17 (1949). The effect of a release of an agent or employee on the liability of the principal or employer is not at issue in the present case.

the action against the employee was based solely on a defense that was personal to the employee. Restatement (Second) Judgments, § 51(1)(b)(1982); see also 27 Am. Jur.2d Employment Relationship § 469 (1996) (distinguishing between finding of no civil liability on part of agent and finding that agent was not guilty of wrongdoing). Comment b to Restatement Section 51 cites a dismissal on the basis of a statute of limitations as an instance where a favorable judgment against one defendant should not preclude the plaintiff from asserting a claim against a second defendant who may be vicariously liable for the first defendant's conduct. "[I]f the judgment in favor of the employee is based solely on a defense that is personal to the employee, such as an expired statute of limitations, then the employee's actual negligence has never been determined." *Leow v. A & B Freight Line, Inc.,* 175 Ill.2d 176, 222 Ill.Dec. 80, 676 N.E.2d 1284, 1294 (1997) (*McMorrow, J.,* specially concurring).

{29} We need not rest our decision in this case entirely on common-law principles. As Plaintiffs point out, *Roberts* held that Section 41–5–13 is a benefit of the Medical Malpractice Act. 114 N.M. at 250–52, 837 P.2d at 444–46. Section 41–5–5(C) provides that "[a] health care provider not qualifying under this section shall not have the benefit of any of the provisions of the Medical Malpractice Act in the event of a malpractice claim against it." Applying Section 41–5–5(C), the Supreme Court held that Section 41–5–13 does not apply to non-qualified health care providers. *Id.* at 254, 837 P.2d at 448. To qualify under the Medical Malpractice Act, a hospital must demonstrate proof of financial responsibility and must pay an annual surcharge assessed by the superintendent. Section 41–5–5(B). We agree with Plaintiffs that if we were to allow PHS to piggyback upon Dr. Nelson's Section 41–5–13 defense, we would be allowing PHS to obtain an important benefit of the Medical Malpractice Act without sharing the burdens imposed on qualified health care providers. We hold that the dismissal of Dr. Nelson based upon a statute of limitations defense personal to qualified healthcare providers may not be asserted by PHS as a defense to vicarious liability for any acts of negligence committed by Dr. Nelson.

## CONCLUSION

{30} The summary judgment in favor of Dr. Nelson is affirmed. The order granting partial summary judgment in favor of PHS is reversed.

{31} **IT IS SO ORDERED.**

WE CONCUR: RICHARD C. BOSSON, Chief Judge, and MICHAEL D. BUSTAMANTE, Judge.